## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FORUSALL, INC.,**<br>809 Laurel St., #1328<br>San Carlos, CA 94070<br><br>       *Plaintiff*,<br><br>   **v.**<br><br>**UNITED STATES DEPARTMENT OF LABOR**<br>200 Constitution Ave., N.W.<br>Washington, DC 20210<br><br>   *and*<br><br>**MARTIN J. WALSH, in his official capacity as SECRETARY OF LABOR**<br>200 Constitution Ave., N.W.<br>Washington, DC 20210<br><br>     *Defendants*. | Case No. _____ |

## <u>COMPLAINT</u>

Plaintiff ForUsAll, Inc. ("ForUsAll"), by and through its counsel, brings this Complaint against Defendants United States Department of Labor ("DOL") and Martin J. Walsh, in his official capacity as United States Secretary of Labor ("Secretary Walsh"). As set forth in more detail below, the Complaint seeks to vacate and set aside under the Administrative Procedure Act ("APA") Compliance Assistance Release No. 2022-01, "401(k) Plan Investments in 'Cryptocurrencies'" (the "Release"), which was issued on March 10, 2022.[1]  The Complaint also seeks related declaratory, injunctive, and other relief.

---

[1] https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/compliance-assistance-releases/2022-01

## INTRODUCTION

1.      "The Administrative Procedure Act was framed against a background of rapid expansion of the administrative process as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices. It created safeguards . . . against arbitrary official encroachment on private rights." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).  These safeguards include requiring that agencies go through a public notice and comment process before issuing rules, *see* 5 U.S.C. § 553, and providing for judicial review where an agency's action is arbitrary, capricious, or in excess of its statutory authority, and where the agency fails to follow the required procedures.  *See* 5 U.S.C. §§ 702, 706.

2.      This lawsuit seeks to preserve the rights of American investors to choose how to invest money in their own retirement accounts.  Brought under the APA, this lawsuit challenges DOL's arbitrary and capricious attempt to restrict the use of cryptocurrency in defined contribution retirement plans, in excess of its authority under the Employee Retirement Income Security Act ("ERISA"), and without following the notice and comment process required under the APA.

3.      Cryptocurrency is a widely accepted asset class.  Tens of millions of Americans have included it in their portfolios, as have some of the nation's largest institutional investors, including Harvard University's endowment.  President Joseph R. Biden Jr. has formally declared it to be the policy of the United States to "promote" the development and use of cryptocurrency.

4.      No asset class is presumptively imprudent under ERISA.

5.      ERISA does not mandate paternalism with respect to participant investments.

6.      The day after President Biden directed federal agencies to work together to "promote" the development and use of cryptocurrency, DOL took the opposite course by nevertheless issuing the Release, which, *inter alia*:

a.  Invented a standard of care, "extreme care" – heretofore unseen in the nearly 50-year history of ERISA and contradicted by the text of the statute – applicable only to cryptocurrency;

b.  Announced a new obligation to monitor investments in "brokerage windows," despite the fact that DOL's own ERISA Advisory Council just reported to Secretary Walsh that: (i) DOL regulations say there is no such obligation; (ii) fiduciaries do not currently engage in such monitoring; and (iii) no additional regulations are necessary on the topic.  When nearly a dozen leading industry trade groups raised concerns about this contradiction, senior DOL officials denied that the newly-announced obligation existed for any investments other than cryptocurrency;

c.  Focused exclusively on the risks of cryptocurrency, without mention of its potential benefits, including diversification, even though DOL's own educational materials list diversification as a basic principle of investing;

d.  Raised the specter that other regulators might shut down trading in one of the most widely recognized cryptocurrencies on the basis of an outdated nearly eight-year-old website post, even though regulators have not done so in the last eight years and President Biden just directed them to do the opposite; and

e.  Threatened to open investigations of plan fiduciaries that offer cryptocurrency.

7.      For these and other reasons discussed in more detail below, DOL's issuance of the Release was arbitrary, capricious, and otherwise not in accordance with law and in excess of DOL's statutory authority, in violation of the APA.  DOL also violated the APA by issuing the Release without going through the notice and comment rulemaking required under the APA.  A senior DOL official has now publicly admitted that DOL considered going through notice and comment rulemaking but decided not to do so after determining that it would be politically inexpedient.  Political expediency is not a valid justification for deciding not to comply with  the APA.

8.      While this lawsuit arises in the context of cryptocurrency, unless the principles at stake here are addressed to require DOL to operate strictly within the limits of its legal authority and to follow the law in undertaking agency actions, tomorrow unlawful federal agency action could just as easily extend to any other type of investment or investment strategy that senior officials at DOL (in this or any future administration) do not find to be entirely to their liking. Indeed, DOL is currently in the process of reversing course on a prior rule it issued (in that instance, through notice and comment rulemaking), characterizing the prior rule as having improperly singled out environmental, social and governance (ESG) investments.  Defined contribution plans governed by ERISA hold approximately $10 trillion in assets – and where those assets may be invested should not be subject to the arbitrary whims of an agency that has no such authority.

9.      The Release should be vacated and set aside under the APA, and DOL should be enjoined from attempting to enforce it.

10.     Plaintiff is targeted by the new DOL rule reflected in the Release and has suffered injury as a result.  Indeed, a senior DOL official explicitly named Plaintiff as a service provider whose business the Release is intended to stymie.

## PARTIES

11.     Plaintiff ForUsAll is a Delaware corporation, with a business address of 809 Laurel St., #1328, San Carlos, CA 94070.  ForUsAll provides administrative and other services to retirement plans and was the first company to announce that it would make cryptocurrency available to 401(k) plan participants through a self-directed window.

12.     Defendant DOL is an executive department of the United States Government. DOL is headquartered at 200 Constitution Ave., N.W., Washington, DC 20210.

13.     Defendant Secretary Walsh is the United States Secretary of Labor and is sued in his official capacity.

## JURISDICTION AND VENUE

14.     This case arises under the APA, 5 U.S.C. § 500 *et seq*., and ERISA, 29 U.S.C. § 1001 *et seq*.  This Court accordingly has jurisdiction under 28 U.S.C. § 1331.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside and/or perform their official duties within this District and "a substantial part of the events or omissions giving rise to the claim" occurred in this District.

## BACKGROUND

### A.     ERISA Plan Investment Menus and Brokerage Windows.

16.     ERISA imposes certain obligations on plan fiduciaries, including the duties of prudence and diversification.  *See* 29 U.S.C. §§ 1104(a)(1)(B) (requiring a fiduciary act "with the care, skill, prudence, and diligence then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and

with like aims"); (a)(1)(C) (requiring a fiduciary to "diversify[] the investments of the plan . . .").

17.     "[I]n a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are

typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries'

particular investment decisions." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020).  As the

Fourth Circuit has explained:

> Such a plan is structured so that each employee-participant has an individual
> account and benefits are based on the amounts contributed to that participant's
> account.  Plan participants decide how much to contribute to their accounts and
> how to allocate their assets among an array of investment options selected by plan
> fiduciaries. This array of investment options is often called a plan's "menu."

*Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 469 (4th Cir. 2020) (cleaned up).

18.     The Supreme Court recently re-affirmed that "even in a defined-contribution plan

where participants choose their investments, plan fiduciaries are required to conduct their own

independent evaluation to determine which investments may be prudently included in the plan's

menu of options." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

19.     While ERISA imposes fiduciary obligations with respect to the selection and

monitoring of investments on a plan's menu of investment options, ERISA does not mandate

paternalism.  *See, e.g.*, *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 369 (D.R.I. 2018) ("ERISA

does not impose that fiduciaries limit plan participants' investment options. . . .  Indeed, courts

have bristled at paternalistic theories that suggest ERISA forbids plan sponsors to allow

participants to make their own choices.") (quoting *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284

(KBF), 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017)).

20.     Accordingly, in addition to selecting investments for the plan's menu of

investment options (referred to as "designated investment alternatives") which plan fiduciaries

believe are prudent, many plans also offer participants the option to invest a portion of their retirement accounts in investments of their own choice through a "self-directed brokerage account" or "brokerage window."  *See* DOL Advisory Council on Employee Welfare and Pension Benefit Plans, *Understanding Brokerage Windows in Self-Directed Retirement Plans* (Dec. 2021) ("DOL Advisory Report") at 7 ("A brokerage window allows participants to invest their account balances held within a self-directed retirement plan in a variety of investments beyond the menu of designated investment alternatives offered directly by the plan.").[2]

21.     DOL regulations explicitly differentiate between investment options selected for inclusion by a fiduciary on a plan's investment menu and investment options available to participants only if they opt in to the use of a brokerage window or similar arrangement.  *See* 29 C.F.R §§ 2550.404a-5(f) (noting that fiduciaries have a "duty to prudently select and monitor providers of services to the plan [and] designated investment alternatives offered under the plan"), (h)(4) ("The term 'designated investment alternative' shall not include 'brokerage windows,' 'self-directed brokerage accounts,' or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan.").  "By indicating that there is a fiduciary duty to prudently select and monitor designative investment alternatives, the regulation suggests that no such obligation applies if investments are unrestricted."  DOL Advisory Report at 9.  *See also id*. at 47 ("Investments accessible through a brokerage window are not routinely monitored by plan fiduciaries, and most experts conclude that, except perhaps in extraordinary circumstances, plan fiduciaries are not obligated to monitor

---

[2] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2021-understanding-brokerage-windows-in-self-directed-retirement-plans.pdf.

brokerage window investments nor do their fiduciary duties apply with respect to those investments.").

22.     DOL has never previously asserted that there is a general fiduciary obligation to select or monitor individual investments within a brokerage window, nor has any court held that such an obligation exists.

23.     In 2012, DOL suggested that, if a plan fiduciary failed to include any "designated investment alternatives," there may be a duty to monitor investments in "a brokerage window or similar arrangement."  *See* DOL Field Assistance Bulletin No. 2012-02, Q30 (May 7, 2012) ("If, through a brokerage window or similar arrangement, non-designated investment alternatives . . . are selected by significant numbers of participants and beneficiaries, an affirmative obligation arises on the part of the plan fiduciary to examine these alternatives and determine whether one or more such alternatives should be treated as designated for purposes of the regulation.").[3]  Less than three months later, however, DOL reversed course and explained that even where a fiduciary fails to include any "designated investment alternatives[,]" a "brokerage window, self-directed brokerage account, or similar plan arrangement" is still not as a "designative investment alternative" to which a monitoring obligation applies.  *See* DOL Field Assistance Bulletin No. 2012-02R, Q30, Q39 (Jul. 30, 2012).[4]

24.     There are no presumptions under ERISA in favor of or against the inclusion of any particular asset class in a retirement plan.  *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418-19, 425 (2014) (rejecting the argument that there is a "special presumption of

---

[3] https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02.
[4] https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02r.

prudence" in favor of a fiduciary's decision to "invest[] participants' savings in the stock of their employer" because "the same standard of prudence applies to all ERISA fiduciaries").  *See also* Amicus Brief of United States of America Supporting Respondents in *Fifth Third Bancorp v. Dudenhoeffer*, No. 2014 WL 880926, at *26 (Mar. 5, 2014) (brief co-authored by DOL which took the position that "various policy reasons" identified in favor of a "presumption of prudence" for employer stock "do not warrant a judicially fashioned" rule "that has no mooring in ERISA's text").

25.     Similarly, DOL has long taken the position that even investments which have unique features "are subject to the fiduciary responsibility rules in the same manner as are any other plan investments."  *See, e.g.*, DOL Information Letter 03-21-1996 (Mar. 21, 1996) ("Investments in derivatives are subject to the fiduciary responsibility rules in the same manner as are any other plan investments. Thus, plan fiduciaries must determine that an investment in derivatives is, among other things, prudent and made solely in the interest of the plan's participants and beneficiaries.");[5] DOL Advisory Council on Employee Welfare and Pension Benefit Plans, *Understanding Hedge Funds and Private Equity Investments* (Nov. 2011) at 27 ("Mr. Campagna [Chief of Division of Fiduciary Interpretations] stated that hedge funds or private equity funds were subject to the same rules as all other plan investments, and the fiduciary should follow the same type of analysis in making any investment decision.").[6]

---

[5] https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/03-21-1996.
[6] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2011-hedge-funds-and-private-equity-investments.pdf.

26.     DOL's investigatory authority is limited to "determin[ing] whether any person has violated or is about to violate any provision of [Title I of ERISA] or any regulation or order thereunder."  29 U.S.C. § 1134(a).

**B.     Cryptocurrencies and Digital Assets.**

27.     "A cryptocurrency is a digital or virtual currency that is secured by cryptography, which makes it nearly impossible to counterfeit or double-spend. Many cryptocurrencies are decentralized networks based on blockchain technology—a distributed ledger enforced by a disparate network of computers. A defining feature of cryptocurrencies is that they are generally not issued by any central authority, rendering them theoretically immune to government interference or manipulation."  Investopedia, *What is Cryptocurrency?* (last visited June 1, 2022).[7]  Cryptocurrencies are a type of "digital asset," which includes other "digital representations of value" including "crypto-assets" and "digital tokens," all of which are "digital representations of value."  Congressional Research Service, *Digital Assets and SEC Regulation* (June 23, 2021) ("Digital Assets and SEC Regulation").[8]  For ease of reference, the Complaint will generally refer to cryptocurrency and other digital assets collectively as "cryptocurrency," as DOL does in the Release.

28.     Cryptocurrency is now widely recognized as its own "asset class," *id*., and has the potential to provide material returns on investment as well as diversification benefits as part of a balanced investment portfolio.  *See, e.g.*, Nasdaq, *Crypto Still Has Diversification Benefits* (Apr. 20, 2022) ("Over time, bitcoin and other digital assets do in fact have low correlations to

---

[7] https://www.investopedia.com/terms/c/cryptocurrency.asp.
[8] https://sgp.fas.org/crs/misc/R46208.pdf.

traditional asset classes, such as stocks and bonds. . . . [Which provides] potential advantages [with] even modest allocations . . . .").[9]

29.     According to Newsweek, "[a]bout 46 million Americans now own at least a share of Bitcoin [one of the most widely recognized cryptocurrencies]—that equals about 17% of the adult population."  Scott Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*, Newsweek (May 11, 2021).[10]  NBC News similarly reported that "21% of . . . Americans polled said they have at least once used or invested in crypto . . . ."  Thomas Franck, *One in five adults has invested in, traded or used cryptocurrency, NBC News poll shows*, CNBC (Mar. 31, 2022).[11]

30.     The wide acceptance of cryptocurrency as an asset class is not limited to individual investors.  For example, "[a] lot of endowments are allocating a small portion [of their portfolio] to crypto," including, according to Bloomberg, "Harvard University, Yale University, Brown University and the University of Michigan" each of which have "multibillion-dollar endowments."  Joanna Ossinger, *Harvard and Yale Endowments Among Those Reportedly Buying Crypto*, Bloomberg (Jan. 25, 2021).[12]

### C.     The Executive Order.

31.     On March 9, 2022, President Biden issued an "Executive Order on Ensuring Responsible Development of Digital Assets."  Exec. Order No. 14067, *Ensuring Responsible Development of Digital Assets*, 87 Fed. Reg. 14,143, 14,147 (Mar. 9, 2022) (the "Executive

---

[9] https://www.nasdaq.com/articles/crypto-still-has-diversification-benefits.
[10] https://www.newsweek.com/46-million-americans-now-own-bitcoin-crypto-goes-mainstream-1590639.
[11] https://www.cnbc.com/2022/03/31/cryptocurrency-news-21percent-of-adults-have-traded-or-used-crypto-nbc-poll-shows.html.
[12] https://www.bloomberg.com/news/articles/2021-01-26/harvard-and-yale-endowments-among-those-reportedly-buying-crypto.

Order"). The Executive Order recognized that "[i]n November 2021, non state issued digital assets reached a combined market capitalization of $3 trillion," and that "[t]he United States has an interest in responsible financial innovation, expanding access to safe and affordable financial services, and reducing the cost of domestic and cross-border funds transfers and payments, including through the continued modernization of public payment systems." 87 Fed. Reg. at 14,143. The Executive Order directed federal agencies, including DOL, that they "must reinforce United States leadership . . . through the responsible development of payment innovations and digital assets" and "must promote . . . responsible innovation that expands equitable access to financial services" and declared that "[t]he United States also has an interest in ensuring that the benefits of financial innovation are enjoyed equitably by all Americans . . . ." *Id.* at 14,144.

32.    The Executive Order specifically directed "the Secretary of the Treasury, in consultation with the Secretary of Labor and the heads of other relevant agencies" to "[w]ithin 180 days . . . submit to the President a report . . . on the implications of developments and adoption of digital assets," and provided that the report, *inter alia*, "shall address the conditions that would drive mass adoption of different types of digital assets," and "include policy recommendations, including potential regulatory and legislative actions, as appropriate, to protect United States consumers, investors, and businesses, and support expanding access to safe and affordable financial services." *Id.* at 14,147.

33.    The Executive Order was widely understood to supplant any hostility individual government officials may have previously expressed with respect to the existence of cryptocurrency and move the federal government towards a unified approach to the expanding use of cryptocurrency. *See, e.g.*, PwC, *Five Key Points on the Biden Administration's Executive*

12

*Order on digital assets* (last visited June 1, 2022) (listing the first "key point" to understand about the Executive Order as the "Biden Administration reveals not-unfriendly crypto stance");[13] Niall Ferguson, *Crypto and the Dollar Are Partners, Not Rivals*, Bloomberg (May 1, 2022) (describing the Executive Order as "[t]he first fruit of . . . lobbying" "for pro-crypto legislation" and noting that "[g]one was the hostile language of last year");[14] Alan N. Rechtschaffen, *Digital Assets Executive Order: The Great Game Changer*, Wilson Center (Mar. 14, 2022) ("The [Executive Order] demonstrates . . . a desire to encourage [the] implementation [of digital assets] . . . .");[15] Alex Gailey, *Biden's New Executive Order on Crypto Is a Big Step in the Right Direction, Experts Say. Here's What Investors Should Know*, NextAdvisor (Mar. 11, 2022) ("Experts say the order will help create a path toward the regulatory clarity needed for mass institutional adoption of Bitcoin and other digital assets.");[16] Reuters, *Bitcoin surges after Biden signs executive order on digital assets* (Mar. 9, 2022), ("Bitcoin soared on Wednesday after President Joe Biden signed an executive order that requires U.S. government agencies to assess the benefits and risks of creating a central bank digital dollar and other cryptocurrency issues.").[17]

### D.     The Response to the Executive Order, and DOL's Release.

34.     Following the Executive Order, the heads of many federal departments identified in the Executive Order immediately issued statements in support of the Executive Order and

---

[13] https://www.pwc.com/us/en/industries/financial-services/library/biden-executive-order-digital-assets.html.

[14] https://www.bloomberg.com/opinion/articles/2022-05-01/niall-ferguson-crypto-and-the-dollar-are-partners-not-rivals.

[15] https://www.wilsoncenter.org/blog-post/digital-assets-executive-order-great-game-changer.

[16] https://time.com/nextadvisor/investing/cryptocurrency/biden-executive-order-crypto-expert-reaction/.

[17] https://www.reuters.com/business/finance/bitcoin-jumps-after-apparent-yellen-statement-quells-us-clampdown-fears-2022-03-09/.

pledged that their departments would work together with the other departments and agencies identified in the Executive Order to fulfill the President's vision.  For example, the Secretary of Commerce, Gina Raimondo, said that "President Biden had identified a bold and prudent path forward for a whole-of-government approach" and that "I particularly welcome President Biden's direction to engage with industry, civil society, and other interagency partners in developing a framework to promote U.S. economic competitiveness by leveraging digital asset technologies and remain eager to hear what we can do to promote the secure and inclusive development of this growing part of our financial services system."  U.S. Dep't of Commerce, *U.S. Secretary of Commerce Gina Raimondo Statement on "Ensuring the Responsible Development of Digital Assets" Executive Order* (Mar. 9, 2022).[18]  The Secretary of the Treasury, Janet Yellen, said that "President Biden's historic executive order calls for a coordinated and comprehensive approach to digital asset policy. . . . Treasury will partner with interagency colleagues to produce a report on the future of money and payment systems."  U.S. Dep't of Treasury, *Statement by Secretary of the Treasury Janet L. Yellen on President Biden's Executive Order on Digital Assets* (Mar. 9, 2022).[19]  The Secretary of State, Anthony Blinken, said that "[t]he United States is committed to the responsible development and design of digital assets" and that "[t]he Department of State will play an important role in the implementation of this E.O."  Press Statement, Anthony J. Blinken, Secretary of State, U.S. Dep't of State, *Ensuring the Responsible Development of Digital Assets* (Mar. 9, 2022).[20]

---

[18] https://www.commerce.gov/news/press-releases/2022/03/us-secretary-commerce-gina-raimondo-statement-ensuring-responsible.

[19] https://home.treasury.gov/news/press-releases/jy0644.

[20] https://www.state.gov/ensuring-the-responsible-development-of-digital-assets/.

35.     Secretary Walsh did not issue a similar statement in support of the Executive

Order.

36.     Instead, the following day, DOL issued the Release, which Secretary Walsh

would later describe to the Washington Post as a "ruling[]" on the use of cryptocurrencies in

401(k) retirement plans.  The Washington Post, *Transcript: The Technology 202: The Future

Infrastructure Workforce* (May 19, 2022).[21]  Without mentioning the Executive Order or any of

the potential benefits of cryptocurrency, the Release stated that "the Department has serious

concerns about the prudence of a fiduciary's decision to expose a 401(k) plan's participants to

direct investments in cryptocurrencies, or other products whose value is tied to

cryptocurrencies."  Accordingly, the Release "cautions plan fiduciaries to exercise extreme care

before they consider adding a cryptocurrency option to a 401(k) plan's investment menu for plan

participants."  The Release also announced that:

> EBSA [DOL's Employee Benefits Security Administration] expects to
> conduct an investigative program aimed at plans that offer participant
> investments in cryptocurrencies and related products, and to take
> appropriate action to protect the interests of plan participants and
> beneficiaries with respect to these investments. The plan fiduciaries
> responsible for overseeing such investment options or allowing such
> investments through brokerage windows should expect to be questioned
> about how they can square their actions with their duties of prudence and
> loyalty in light of the risks described above.

37.     On the same day as the Release, Acting Assistant Secretary of Labor Ali S.

Khawar made a blog post (the "Blog Post") on DOL's website, entitled "Cryptocurrency

Concerns: Why We're Working to Protect Retirement Savings from Volatile Digital

Investments." Ali S. Khawar, *Cryptocurrency Concerns: Why We're Working to Protect*

---

[21] https://www.washingtonpost.com/washington-post-live/2022/05/19/transcript-technology-202-
future-infrastructure-workforce.

*Retirement Savings from Volatile Digital Investments*, DOL Blog (Mar. 10, 2022).[22]  The Blog Post did not make any mention of the President's directive that the federal government should "promote" the development and use of cryptocurrency.  Instead, the Blog Post selectively mentioned only the risks of cryptocurrencies discussed in the Executive Order:  "President Biden's recent executive order on ensuring responsible development of digital assets highlights the significant financial risks digital assets can pose to consumers, investors and businesses in the absence of appropriate protections."

38.     No other federal department or agency has responded to the Executive Order in this fashion.

39.     In asserting that other agencies may take regulatory action which "limit[s] or shut[s] off the ability to use or trade bitcoins," the Release quotes an alert from the Financial Industry Regulatory Authority that was "Last Updated" on "May 7, 2014" – nearly eight years before the Executive Order.  There is no basis to expect that any other federal department or agency will defy the Executive Order.  Indeed, the Secretary of the Treasury, with whom the Executive Order tasks with "consult[ing] with the Secretary of Labor and the heads of other relevant agencies," has already made clear in response to the Executive Order that while "[d]igital assets may be new . . . many of the issues they present are not" and that, "[w]herever possible, regulation should be 'tech neutral.'  For example, consumers, investors, and businesses should be protected from fraud and misleading statements regardless of whether assets are stored on a balance sheet or distributed ledger."  U.S. Dep't of Treasury, *Remarks from Secretary of the Treasury Janet L. Yellen on Digital Assets* (Mar. 9, 2022).[23]

---

[22] https://blog.dol.gov/2022/03/10/cryptocurrency-concerns-why-were-working-to-protect-retirement-savings-from-volatile-digital-investments.
[23] https://home.treasury.gov/news/press-releases/jy0706.

40.     DOL previously issued another "Compliance Assistance Release" on January 12,

2021 (the "2021 Release") that addressed the risks of "missing" participants.  DOL Compliance

Assistance Release 2021-01, *Terminated Vested Participants Project Defined Benefit Pension

Plans* (Jan. 12, 2021).[24]  The 2021 Release concluded with the following statement:  "The

contents of this document do not have the force and effect of law, and are not meant to bind the

public in any way.  This document is intended only to provide clarity to the public regarding

existing requirements under the law or agency policies."  *Id.*  By contrast, no such language is

included in the Release.

41.     Amid criticism of the Release, *see infra* at ¶ 42, Mr. Khawar publicly admitted

that DOL was in a rush because of Super Bowl commercials and that the Department

deliberately circumvented the APA's rulemaking requirements in order to front-run the whole-

of-government approach to cryptocurrency regulation laid out in the Executive Order.  *See, e.g.*,

Kellie Mejdrich, *Under Fire From Biz Groups, DOL Stands By Crypto Guidance*, Law360 (Apr.

22, 2022)[25] ("Law360 Article") ("The U.S. Department of Labor has no plans to withdraw

cryptocurrency guidance for retirement plan fiduciaries that business groups have criticized as an

end-run around the formal rulemaking process, the acting head of the DOL's employee benefits

arm told Law360 in an exclusive interview Friday. . . . Khawar said the agency was partially

motivated to create the guidance based on what's happening in the cryptocurrency space. 'People

are seeing Superbowl commercials that are not just advertising that cryptocurrency is an

investment, but ... actively encouraging them to put their tax-advantaged retirement dollars in

---

[24] https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/retirement/missing-participants-guidance/compliance-assistance-release-2021-01.
[25] https://www.law360.com/articles/1486578.

these assets,' he said.");[26] *Brian Croce*, *DOL's Khawar discusses Fidelity's crypto offering, ESG proposal*, Pensions & Investments (May 19, 2022) ("DOL & Fidelity Article") ("Had the Labor Department gone through a standard rule-making process — which takes at least months and potentially years — on its cryptocurrency guidance, the 'regulatory landscape was not going to look the same,' Mr. Khawar said.").[27]

### E.    The Aftermath of the Release and DOL's Statements.

42.    The Release was met with surprise and criticism, including from leading industry groups, which wrote to Mr. Khawar "express[ing] no view on the appropriateness of retirement plan investments in cryptocurrency," but which were nevertheless troubled by DOL's dramatic deviation from the law and regulatory norms. *See* Am. Bankers Ass'n, et al., *Letter to DOL on 401(k) Plan Investments in Cryptocurrencies* (Apr. 12, 2022).[28] In particular, the industry groups wrote that: (i) they were "troubled by what we perceive to be a trend at EBSA away from rulemaking based on a robust notice and comment process," and that "this trend is inconsistent with the Administrative Procedure Act;" (ii) the Release's stance with respect to monitoring investments in brokerage windows was "inconsistent with current law and current established practices" and "inappropriate and impracticable;" (iii) the Release's "admonition that fiduciaries should use 'extreme care' when considering adding cryptocurrency . . . is not the legal standard

---

[26] None of the Super Bowl commercials went beyond "just advertising" cryptocurrency as "an investment" and mentioned putting "tax-advantaged retirement dollars in [cryptocurrency]."
[27] https://www.pionline.com/regulation/dols-khawar-discusses-fidelitys-crypto-offering-esg-proposal
[28] https://www.aba.com/-/media/documents/comment-letter/jointltrdolcrypto20220412.pdf?rev=9d745fce0f0b46f9b82c6602e7dabfd2.  The full list of industry groups which joined the letter are: American Bankers Association, American Benefits Council, American Council of Life Insurers, The Defined Contribution Alternatives Association, The ERISA Industry Committee, Insured Retirement Institute, Investment Company Institute, Securities Industry and Financial Markets Association, The Small Business Council of America, The SPARK Institute, and United States Chamber of Commerce.

applicable to fiduciaries under ERISA" and "creates confusion regarding the legal standard to which fiduciaries are subject"; and (iv) DOL lacked "any legal basis" to "issu[e] guidance on which investments are inherently appropriate or inappropriate," and that it "would set a concerning precedent for future announcements by any Administration about what investments are permissible." *Id.* The industry groups accordingly "ask[ed] that the cryptocurrency guidance be withdrawn, pending a robust notice and comment period. At a minimum, it is critical that the announcement of a new fiduciary standard with respect to brokerage windows be withdrawn." *Id.* Each of these criticisms by the industry groups are well founded.

43.     A senior DOL official responded to the concern that "the department is silently rewriting the rules on brokerage windows, suggesting that fiduciaries . . . will have to monitor all of the investments participants can access," by denying that DOL was imposing any such obligation on brokerage windows: "We haven't imposed that obligation. . . . It's much more about giving clear notice that fiduciaries need to be very careful. They need to make sure they're looking out for plan participants." Austin R. Ramsey & Rebecca Rainey, *Punching In: Whiling Away Time at DOL's Wage and Hour Division*, Bloomberg Law (Apr. 18, 2022) (emphasis omitted).[29] Mr. Khawar responded by saying that while "[t]he industry is quite focused on this brokerage window question . . . this is like five words in multipage guidance" and that "plan sponsors should consider the brokerage window reference in the context of . . . cryptocurrency." Law360 Article.

---

[29] https://news.bloomberglaw.com/daily-labor-report/punching-in-whiling-away-time-at-dols-wage-and-hour-division.

44.     Neither the Release nor statements by DOL officials offer any coherent rationale for how there could be a duty to select and monitor investments in a brokerage window if those investments are cryptocurrency, but not if they are any other type of investment.

45.     At the same conference in May at which Mr. Khawar admitted the Department deliberately elected not to follow the APA's rulemaking requirements, *see supra* at ¶ 41, he expressed his disagreement with "Trump administration rules [that he viewed] as 'putting a thumb on the scale' against ESG investing."  DOL & Fidelity Article.  While it is inappropriate for DOL to put its thumb on the scale for or against particular types of investments, including cryptocurrency, it is notable that the short-lived rule which DOL now says improperly put a thumb on the scale against ESG investing was done through notice and comment rulemaking.[30]

46.     Other public statements similarly demonstrate DOL's arbitrary and capricious bias against cryptocurrency.  For example, in yet another interview, Mr. Khawar said: "Right now, you don't know whether you're betting on the winning horse or not."  Sam Sutton, *Bitcoin's Crashing. The Biden administration wants to keep it out of your 401(k)*, Politico (May 13, 2022).[31]  That, of course, is true of virtually all investments made available in retirement plans, which DOL is well aware of and even tells participants in educational materials it publishes.  *See* DOL, *Choosing the Right Person to Give You Investment Advice: Information for Investors in Retirement Plans and Individual Retirement Accounts* (Apr. 2021) ("Even the best investments typically involve some risk of loss . . . . ").[32]  DOL's educational materials also direct individuals to "[p]ut your savings in different types of investments" and that "[b]y

---

[30] *See* Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72,846 (Nov. 13, 2020).
[31] https://www.politico.com/news/2022/05/13/bitcoin-crashing-fidelity-401k-00031241.
[32] https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/choosing-the-right-person-to-give-you-investment-advice.

diversifying this way, you are more likely to reduce risk and improve return," DOL, *Top 10 Ways to Prepare for Retirement* (Sept. 2021)[33] – yet the Release and Blog Post are silent on the potential diversification benefits of cryptocurrency.

47.    On April 26, 2022, Fidelity, one of the largest service providers to defined contribution retirement plans in the United States "announced the launch of Fidelity's workplace Digital Assets Account (DAA), the industry's first offering that will enable individuals to have a portion of their retirement savings allocated to bitcoin through the core 401(k) plan investment lineup."  Press Release, *Fidelity Investments Advances Leading Position as Digital Assets Provider With Launch of Industry's First-of-Its-Kind Bitcoin Offering for 401(k) Core Investment Lineup*, Fidelity (Apr. 26, 2022).[34]  Mr. Khawar responded by telling the Wall Street Journal that "[w]e have grave concerns with what Fidelity has done," which also reported that DOL had "specific concerns" about "Fidelity's plan . . . to cap . . . its bitcoin offering at 20% of 401(k) account balances . . . ."  Anne Tergesen, *Labor Department Criticizes Fidelity's Plan to Put Bitcoin on 401(k) Menu*, Wall Street Journal (Apr. 28, 2022) ("Wall Street Journal Article").[35]  The Wall Street Journal Article further reported that:

> Mr. Khawar said the Labor Department has similar concerns with an offering from ForUsAll Inc., a 401(k) provider that announced last year a deal with the institutional arm of cryptocurrency exchange Coinbase Global Inc. That deal will allow workers in plans it administers to invest up to 5% of their 401(k) contributions in bitcoin, ether, litecoin and others via a self-directed digital-asset window.

---

[33] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/top-10-ways-to-prepare-for-retirement.pdf.

[34] https://fidelityinvestments2020news.q4web.com/press-releases/news-details/2022/Fidelity-Investments-Advances-Leading-Position-as-Digital-Assets-Provider-With-Launch-of-Industrys-First-of-Its-Kind-Bitcoin-Offering-for-401k-Core-Investment-Lineup/default.aspx.

[35] https://www.wsj.com/articles/labor-department-criticizes-fidelitys-plan-to-put-bitcoin-on-401-k-menu-11651197309.

ForUsAll said it protects investors by offering education and guardrails that cap digital-currency allocations at 5%.

"At a time when foundations, endowments and now pension plans are investing in cryptocurrency, blocking access puts everyday Americans at a structural disadvantage, deepening an already wide retirement gap," the company said in a statement.

48.     In addition to capping new contributions and new allocations to cryptocurrency at five percent, Plaintiff ForUsAll has implemented numerous other protections for participants, including: (i) requiring them to review educational materials about cryptocurrency and take an interactive quiz that covers the risks of cryptocurrencies before investing; and (ii) using secure storage methods such as "cold" or offline storage, which means that participants do not have to manage digital wallets or private keys.  These directly address key concerns set forth in the Release.

49.     ForUsAll shared this information with senior DOL officials, including Mr. Khawar, prior to the Wall Street Journal Article and DOL has not identified any additional concrete step ForUsAll could take that would address DOL's purported concerns.  Indeed, "[w]hen asked what would make the Labor Department more comfortable with cryptocurrencies," Mr. Khawar was not able to provide any answer to the question other than that other agencies were looking into it as part of the "'whole-of-government effort' to solve for the concerns outlined in the guidance."  Brian Croce, *DOL's Ali Khawar says participants' best interests is still priority*, Pension & Investments (Mar. 14, 2022).[36]

50.     ForUsAll has been in touch with plans which had already agreed to add cryptocurrency through ForUsAll's program prior to the Release and DOL officials' public comments following the Release.  While the majority of the plans remain interested in

---

[36] https://www.pionline.com/esg/dols-ali-khawar-says-participants-best-interests-still-priority.

proceeding with the inclusion of cryptocurrency, approximately one-third of the plans ForUsAll has discussed the matter with have indicated that, despite their interest in including cryptocurrency, they do not intend to proceed at this time in light of Defendants' enforcement threats.  Through the loss of this business, ForUsAll has been and continues to be directly damaged by Defendants' actions as described in the Complaint, and participants' access to cryptocurrency has been and continues to be improperly impeded by Defendants' actions as described in the Complaint.

## CLAIMS FOR RELIEF

### COUNT ONE

**(Failure to Engage in Notice and Comment Rulemaking Under APA §§ 553, 706)**

51.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

52.     The Release constitutes a "rule" as defined in 5 U.S.C. § 551(4) because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."  Accordingly, subject to exceptions not applicable here, DOL was required to use notice and comment rulemaking to implement it.  *See* 5 U.S.C. § 553(b).  DOL failed to do so.

53.     DOL has publicly acknowledged that it considered using notice and comment rulemaking, but decided not to for reasons unrelated to the substantive nature of the rules prescribed in the Release, including what it deemed to be political expedience.  DOL has not demonstrated "good cause" within the meaning of 5 U.S.C. § 553(b)(B) for its deliberate circumvention of notice and comment rulemaking.

54.     The Release is "final agency action" within the meaning of 5 U.S.C. § 704 for which there is no other adequate remedy because, *inter alia*, it represents the position of DOL, as

confirmed by Secretary Walsh, and DOL has threatened to open investigations of plan fiduciaries that offer cryptocurrencies.

55.     Because DOL issued the Release "without observance of procedure required by law," it is "unlawful and [shall be] set aside."  5 U.S.C. § 706(2)(D).

## COUNT TWO

### (Arbitrary and Capricious Action in Excess of Statutory Authority Under APA § 706 and Declaratory Judgment Act, 28 U.S.C § 2201)

56.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

57.     The Release was the product of rushed decision-making, relied on inaccurate and outdated information and irrational assumptions, and failed to incorporate relevant information and the views of relevant stakeholders, including but not limited to information and views provided by the President of the United States.

58.     The Release misstates the applicable standard of care, which is not "extreme care" but "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"  29 U.S.C. § 1104(a)(1)(B).

59.     The Release asserts that there is a fiduciary duty to select and monitor "investments through brokerage windows" in the context of cryptocurrency, even though no such duty has ever been articulated by a court or DOL, and even though DOL officials have stated that the rule does not apply outside the context of cryptocurrency.

60.     The Release is based, at least in part, on a bias against cryptocurrency, is inconsistent with existing DOL pronouncements and the actions of other federal departments and agencies, and singles out cryptocurrency for disparate treatment.

61.     The Release improperly threatens to open investigations of and impose costs on plans and fiduciaries who take lawful action.

62.     DOL's issuance of the Release was arbitrary, capricious, and otherwise not in accordance with law, and in excess of DOL's statutory jurisdiction, authority, or limitations, and is therefore "unlawful and [shall be] set aside."  5 U.S.C. §§ 706(2)(A), (C).

### PRAYER FOR RELIEF

63.     WHEREFORE, Plaintiff prays for an order and judgment:

a. Declaring that the Release was issued by DOL without observance of procedures required by law under 5 U.S.C. § 706(2)(D); is arbitrary, capricious, or otherwise contrary to law under 5 U.S.C. § 706(2)(A); and is in excess of DOL's statutory jurisdiction, authority, or limitations under 5 U.S.C. § 706(2)(C).

b. Vacating and setting aside the Release;

c. Enjoining DOL and each and every of its officers, employees, and agents from implementing, applying, or taking any action under, based on, or in furtherance of the Release, anywhere within DOL's jurisdiction;

d. Declaring that DOL's investigatory authority is limited to investigating violations of Title I of ERISA, and may not be used for any other purpose, including but not limited to, harassing or intimidating individuals, imposing costs on individuals for taking lawful action, or otherwise using its investigatory authority to seek adherence to substantive rules that it has not set forth in regulatory guidance;

e. Awarding Plaintiff reasonable costs and attorneys' fees incurred in bringing this action; and

f. Granting any such other and additional relief as this Court deems just and proper.

Dated:  June 2, 2022

Respectfully submitted,

GROOM LAW GROUP, CHARTERED

*/s/ Edward J. Meehan*
Edward J. Meehan (D.C. Bar No. 413993)
David Levine (D.C. Bar. No. 463560)*
Kevin L. Walsh (D.C. Bar. No. 990291)*
Samuel I. Levin (D.C. Bar. No. 1044774)*
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 857-0620
Fax: (202) 659-4503
E-mail: emeehan@groom.com

*Counsel for Plaintiff ForUsAll, Inc.*

*admission applications forthcoming*