**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FORUSALL, INC.,** | |
| *Plaintiff,* | Case No. 22-cv-1551 |
| **v.** | Hon. Christopher R. Cooper |
| **UNITED STATES DEPARTMENT OF LABOR** *et al.,* | |
| *Defendants.* | |

<u>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT................................................................................................................... 1

I.   FORUSALL HAS FAILED TO SHOW IT HAS STANDING............................................... 1

    A.   ForUsAll has not alleged a sufficient causal connection. ................................... 2

    B.   ForUsAll's requested relief would not remedy the asserted injury. .................. 7

II.   THE RELEASE IS NOT REVIEWABLE FINAL AGENCY ACTION. ...................................... 10

    A.   The Release is not the consummation of the Department's process. ............... 10

    B.   The Release does not create legal consequences. ................................................ 13

III.   NOTICE AND COMMENT WAS UNNECESSARY BEFORE ISSUING THE RELEASE. ......... 19

CONCLUSION ................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Appalachian Power Co. v. EPA*,
　208 F.3d 1015 (D.C. Cir. 2000) ................................................................... 13, 17

*Arpaio v. Obama*,
　797 F.3d 11 (D.C. Cir. 2015) ........................................................................... 4

*Bennett v. Spear*,
　520 U.S. 154 (1997) ........................................................................................ 10

*Block v. Meese*,
　793 F.2d 1303 (D.C. Cir. 1986) .................................................................... 4, 5

*Cal. Cmtys. Against Toxics v. EPA*,
　934 F.3d 627 (D.C. Cir. 2019) ........................................................................ 13

*Ciox Health, LLC v. Azar*,
　435 F. Supp. 3d 30 (D.D.C. 2020) ........................................................... 8, 9, 13

*\*Cmty. for Creative Non-Violence v. Pierce*,
　814 F.2d 663 (D.C. Cir. 1987) ...................................................................... 3, 4

*Comm. for Fairness v. Kemp*,
　791 F. Supp. 888 (D.D.C. 1992) ..................................................................... 21

*Competitive Enter. Inst. v. FCC*,
　970 F.3d 372 (D.C. Cir. 2020) .................................................................. 3, 5, 7

*Ctr. for Bio. Diversity v. Dep't of Interior*,
　563 F.3d 466 (D.C. Cir. 2009) .......................................................................... 5

*Cty. of Delaware v. Dep't of Transp*,
　554 F.3d 143 (D.C. Cir. 2009) .......................................................................... 9

*Dep't of Commerce v. New York*,
　139 S. Ct. 2551 (2019) ...................................................................................... 5

*Double R Ranch Tr. v. Need*,
　284 F. Supp. 3d 21 (D.D.C. 2018) ............................................................ 2, 4, 6

*Energy Future Coalition v. EPA*,
　793 F.3d 141 (D.C. Cir. 2015) .......................................................................... 5

*Fla. Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ................................................................................ 6

*Frozen Food Express v. United States*,
  351 U.S. 40 (1956) ........................................................................................... 12

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ......................................................................................... 10

*Hughes v. Nw. Univ.*,
  142 S. Ct. 737 (2022) ....................................................................................... 17

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ........................................................................ 19

*Larson v. Allina Health Sys.*,
  350 F. Supp. 3d 780 (D. Minn. 2018) ............................................................ 15

*Lewis v. Casey*,
  518 U.S. 343 (1996) ........................................................................................... 4

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 1, 3

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ......................................................................................... 10

*Moitoso v. FMR LLC*,
  451 F. Supp. 3d 189 (D. Mass. 2020) ............................................................ 14

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ........................................................... 17, 18, 19

*POET Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020) ........................................................................ 18

*Renal Physicians Ass'n v. Dep't of Health & Human Servs.*,
  489 F.3d 1267 (D.C. Cir. 2007) ................................................................. 7, 8, 9

*Sierra Club v. Mainella*,
  2005 WL 3276264 (D.D.C. Sept. 1, 2005) ....................................................... 9

*Stegemann v. Gannett Co.*,
  970 F.3d 465 (4th Cir. 2020) ..................................................................... 11, 14

iii

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015) ............................................................................................ 8, 11

*Tozzi v. Department of Health & Human Services*,
  271 F.3d 301 (D.C. Cir. 2001) ................................................................................ 5

*\*United States Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016) ...................................................................................... 12, 18

*US Ecology, Inc. v. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) ................................................................................. 7

*Valero Energy Corp. v. EPA*,
  927 F.3d 532 (D.C. Cir. 2019) ...................................................................... 18, 19

*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................................. 2

**Statutes**

5 U.S.C. § 704 ........................................................................................................ 10

29 U.S.C. § 1104 ...................................................................................... 11, 17, 21

29 U.S.C. § 1109 ..................................................................................................... 11

29 U.S.C. § 1132 ............................................................................................... 8, 21

29 U.S.C. § 1134 ..................................................................................................... 21

**Rules**

Fed. R. Civ. P. 12 .................................................................................................. 1, 6

**Regulations**

28 C.F.R. § 5.401 (1985) ....................................................................................... 5

29 C.F.R. Part 89 ................................................................................................... 17

29 C.F.R. § 2550.404a-5 ...................................................................................... 14

36 C.F.R. § 9.32 ...................................................................................................... 9

*Promoting Regulatory Openness Through Good Guidance (PRO Good Guidance)*,
  85 Fed. Reg. 53,163 (Aug. 28, 2020) ................................................................. 17

*Rescission of Department of Labor Rule on Guidance*,
   86 Fed. Reg. 7,237 (Jan. 27, 2021) ........................................................................ 17

Executive Order No. 14067, 87 Fed. Reg. 14143 (Mar. 9, 2022) ........................................... 20

**Other Authorities**

Dep't of Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses*
   (Sept. 2022), https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf .. 20

EBSA Enforcement Manual, *available at*
   https://www.dol.gov/agencies/ebsa/about-ebsa/our-activites/enforcement ........... 4

Kellie Mejdrich, *Under Fire From Biz Groups, DOL Stands By Crypto Guidance*, Law360
   (Apr. 22, 200), https://www.law360.com/articles/1486578 ........................................... 16

Rebecca Rainey & Austin R. Ramsey, *Punching In: Whiling Away Time at DOL's Wage
   and Hour Division*, Bloomberg Law, https://news.bloomberglaw.com/daily-labor-
   report/punching-in-whiling-away-time-at-dols-wage-and-hour-division (last
   updated Apr. 18, 2022) ........................................................................ 15, 16, 20

Advisory Council on Employee Welfare and Pension Benefit Plans, *Understanding
   Brokerage Windows in Self-Directed Retirement Plans* (Dec. 2021), *available at*
   https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-
   advisory-council/2021-understanding-brokerage-windows-in-self-directed-
   retirement-plans.pdf ........................................................................ 15

## INTRODUCTION

Plaintiff ForUsAll, Inc. faults the Department of Labor and Secretary Walsh (collectively, "Defendants" or "the Department") for issuing Compliance Assistance Release No. 2022-01, ECF No. 10-2 ("the Release"), and thereby informing plan fiduciaries of the Department's concerns with 401(k) plans offering cryptocurrency investment options. The upshot of ForUsAll's claims is a less transparent and nimble regulatory process.

Defendants moved to dismiss this action because ForUsAll lacks standing, the Release is not final agency action, and the Release is not a legislative rule. *See* ECF No. 10-1 ("Mot."). In its opposition, ECF No. 11 ("Opp."), ForUsAll exaggerates both the reach of the Release as well as the detail of its own allegations. The Release is not the cause of ForUsAll's alleged injuries, its vacatur would not redress any such alleged harms, and it does not impose legal consequences on ForUsAll or regulated entities. To the contrary, the Release merely conveys the risks that the Department sees in 401(k) plan fiduciaries offering cryptocurrency investment options. ForUsAll's arguments to the contrary fail, and this case should be dismissed for lack of subject-matter jurisdiction or failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6).

## ARGUMENT

I. **FORUSALL HAS FAILED TO SHOW IT HAS STANDING.**

It is undisputed that ForUsAll has the burden of establishing that the Court has subject-matter jurisdiction in this case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As to standing, ForUsAll alleges that it has suffered injury in the form of lost business

opportunities, *see* Compl. ¶ 50, ECF No. 1, but as Defendants demonstrated in their motion to dismiss (at 8-10), ForUsAll has failed to allege enough facts showing that the Release caused that so-called injury or that its asserted injury would be redressed by the requested relief. ForUsAll has not directed the Court to allegations beyond those in Paragraph 50 of its complaint, submitted declarations buttressing its claims, or otherwise supplemented the record. Its exaggerations both of Defendants' arguments and its own complaint are unavailing. The Court lacks jurisdiction.

A.     **ForUsAll has not alleged a sufficient causal connection.**

At this stage in the litigation, ForUsAll must allege facts that, if proven, would demonstrate that its "asserted injury was the consequence of the defendants' actions." *Warth v. Seldin*, 422 U.S. 490, 505 (1975); *see Double R Ranch Tr. v. Need*, 284 F. Supp. 3d 21, 26 (D.D.C. 2018). Paragraph 50—as ForUsAll seems to concede, Opp. at 12—contains the only allegations that could plausibly satisfy that requirement. And those allegations make clear that the decisions of third parties—not Defendants—were the immediate cause of ForUsAll's lost opportunities. *See* Mot. at 12-13. Even assuming Department action played some role in those plans' decisions, as opposed to just their independent decisionmaking, that paragraph does not show that the Release was a *substantial* factor in these plans' choice not to contract with ForUsAll. *Id.* at 13-14. ForUsAll's responses do not remedy these deficiencies.

*First*, ForUsAll asserts that Defendants' arguments regarding third parties' involvement "fail[] as a matter of law" and are "'impossible to maintain'" under binding law. Opp. at 8 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)); *see id.* at 8-10.

That contention, however, depends on a mischaracterization of the governing law and Defendants' arguments.

Starting with the law: the Supreme Court has recognized that "when the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562. A plaintiff must "adduce facts showing that those [third-party] choices have been … made in such manner as to produce causation," *id.*, and that "the agency action is at least a substantial factor motivating the third parties' actions against [the plaintiff]," *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987). It is not enough that the challenged action is "only one of the many factors whose relative influence may affect the third parties' behavior." *Cmty. for Creative Non-Violence*, 814 F.2d at 669; *accord Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020) ("A permissible theory of standing 'does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties.'" (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)).

Contrary to ForUsAll's claims (at 8-9), Defendants have never suggested a different standard applies, *see* Mot. at 12. Rather, Defendants contend that ForUsAll's claims fail the test. Paragraph 50 states that some number of plans had previously agreed to offer cryptocurrency through ForUsAll's program "prior to the Release and DOL officials' public comments following the Release," and afterwards, certain plans "indicated" that they did "not intend to proceed at this time in light of Defendants' enforcement threats." Compl ¶ 50. But "the Release" is not synonymous with unspecified

"enforcement threats," Mot. at 13-14, and "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).[1] ForUsAll must allege that the Release itself—not generalized "threats" or perceived hostility toward cryptocurrency—was a substantial factor in the plans' decision not to contract with ForUsAll. As it stands, there is a gap in the causal chain between ForUsAll's purported injury (loss of business opportunity) and the agency action being challenged (the Release). ForUsAll has not fixed that disconnect with declarations or other evidence. *Cf. Double R Ranch Tr.*, 284 F. Supp. 3d at 26 ("in considering a motion to dismiss for lack of standing, the Court may look to materials outside of the complaint, such as a plaintiff's sworn declaration"). And efforts to add to the complaint's allegations through briefing are improper. *See Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015). As a result, even taking the allegations in the complaint as true, ForUsAll has failed to plead a sufficient causal connection. *See, e.g., Cmty. for Creative Non-Violence*, 814 F.2d at 669.

The cases on which ForUsAll relies demonstrate these deficiencies. For example, in *Block*, a regulation required foreign agents who produce "political propaganda" films to file a publicly available report with the Department of Justice, listing such films, where and when they were shown in the United States, and the estimated attendance. *See* 793

---

[1] That the Employee Benefits Security Administration ("EBSA") "expects to conduct an investigative program" and question plan fiduciaries is nothing out of the ordinary. EBSA has many investigative initiatives and priorities. *See* EBSA Enforcement Manual at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activites/enforcement.
ForUsAll's reliance on a routine EBSA practice, i.e., providing the public with notice of its intended investigative activities, is unavailing.

F.2d at 1307 (citing 28 C.F.R. § 5.401(b) (1985)). The U.S. distributor for one such foreign agent's films claimed that it was injured by this regulation because "but for" the government's designation of a particular film as propaganda (triggering the listing requirement), a particular entity would have purchased that film from the distributor. *Id.* at 1308 (citing filed declarations). The Court concluded this showing was sufficient to establish "*de facto* causality" even if the entity's interpretation of the listing was irrational. *Id.* at 1309. ForUsAll seems to suggest it is in a similar position to the distributor in *Block*, Opp. at 10-11, but the key difference here is that ForUsAll has not tied the plans' decision not to do business with ForUsAll to the specific action being challenged, nor has it pointed to a specific government action taken regarding ForUsAll or its particular product.   This case is thus materially different from *Block*. The same omission distinguishes this case from *Department of Commerce*, 139 S. Ct. at 2556 (specific addition to the census); *Tozzi v. Department of Health & Human Services*, 271 F.3d 301, 309 (D.C. Cir. 2001) (specific listing of product as carcinogen), and *Energy Future Coalition v. EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (specific regulation baring use of ethanol as test fuel). *See* Opp. at 12; *see also Competitive Enter. Inst.*, 970 F.3d at 383-88 (finding sufficient allegations for only certain claims).

*Second*, ForUsAll attempts to invert the burden of establishing standing by suggesting that Defendants had an obligation to submit material in addition to the complaint. *See* Opp. at 12, 13 n.7. But the plaintiff has the burden of establishing standing, including "adduc[ing] facts showing that those [third-party] choices have been or will be made in such a manner as to produce causation." *Ctr. for Bio. Diversity v. Dep't of Interior*,

563 F.3d 466, 478 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 562). At the motion-to-dismiss stage, this burden can be satisfied by directing the Court to factual allegations in the complaint (which must be accepted as true), but when faced with a Rule 12(b)(1) challenge, the plaintiff may also submit declarations adding factual allegations. *See Double R Ranch Tr.*, 284 F. Supp. 3d at 26. Defendants identified a number of holes in ForUsAll's causation allegations, rendering them speculative in their current form. *See* Mot. at 12-14. That Defendants also recognized that ForUsAll could potentially submit declarations filling in those gaps does not place the burden on Defendants to negate any conceivable basis of jurisdiction.

*Third*, ForUsAll confuses various points that indicate that its causal chain is too attenuated or implausible with pleading requirements. In the motion (at 13-14), Defendants identified various reasons that ForUsAll's lost opportunities are unlikely to be a consequence of the Release, including that the Release does not preclude any plan from adopting a cryptocurrency option, that plan fiduciaries have different risk tolerances and an independent obligation to evaluate whether offering such an option is prudent, that different plans made different choices, and that ForUsAll fails to allege that the Department has taken any enforcement action based on the Release. ForUsAll responds that none of them is necessarily determinative, *see, e.g.*, Opp at 9-11, but Defendants did not suggest they were. Rather, each one renders ForUsAll's causation claim more speculative, and taken together, they undermine its claim for standing. *See, e.g.*, *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc) ("The greater

number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true.").

**B.      ForUsAll's requested relief would not remedy the asserted injury.**

In the motion (at 15-16), Defendants demonstrated that each form of relief that ForUsAll requested, even assuming it were granted, would not redress ForUsAll's claimed injury. ForUsAll acknowledges (Opp. at 14) that redress in this case "depends on the cooperation of … third part[ies]"—the plans that chose to forgo contracting with ForUsAll after issuance of the Release—but ForUsAll has failed to allege a basis for concluding the plans would change course if ForUsAll were successful in this case. *US Ecology, Inc. v. Dep't of Interior*, 231 F.3d 20, 24-25 (D.C. Cir. 2000). That alone dooms its claim for standing. *See, e.g., Renal Physicians Ass'n v. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("a bald allegation of standing is not enough to survive even a motion to dismiss where neither the factual allegations nor their logic establish redressability").

 ForUsAll nevertheless asserts that its arguments in favor of causation necessarily apply to redressability because there supposedly is no "new status quo" that is being '"held in place by other forces' besides the government action at issue." Opp. at 14 (quoting *Competitive Enter. Inst.*, 970 F.3d at 385). But this assumes that contracting with ForUsAll is in the plans' interests, *cf. Competitive Enter. Inst.*, 970 F.3d at 386 (crediting assertions "firmly rooted in the basic laws of economics"), and, perhaps more importantly, ignores that plan fiduciaries have a background duty of prudence. The Release on its face outlines certain "significant risks and challenges" associated with

cryptocurrency. Release at 1. The reality of these risks and challenges would be unchanged by the Release's rescission. Those risks and challenges—and fiduciaries' understanding that the Department is aware of them—will also not change with this litigation. Given that plan fiduciaries could reasonably decide to forgo offering cryptocurrency investment options in light of those risks and challenges or based on cryptocurrency's recent market performance, regardless of whether the Release exists, is more than plausible. ForUsAll has an obligation to allege facts showing certain plans would not make that choice, *see, e.g., Renal Physicians*, 489 F.3d at 1278—and it has failed to do so.

Relying on *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30 (D.D.C. 2020), ForUsAll also argues that Defendants are wrong to note that ForUsAll's requested relief would not redress the claimed injury given ERISA's continued existence because it "conflate[s] Article III standing with merits issues." Opp. at 14. But once more, ForUsAll ignores the governing substantive law and its own allegations. ERISA imposes a duty of prudence on plan fiduciaries, which requires them—among other things—"to monitor [plan] investments and remove imprudent ones," *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015), and the statute authorizes the Department to investigate and enforce those fiduciary duties, 29 U.S.C. §§ 1132(a)(1)-(2), 1134(a). ForUsAll does not challenge either proposition; its claims are procedural in nature, not substantive challenges to the statute or the Department's authority. Absent such a challenge, there is no reason to suspect that the holdout plans would view their fiduciary duties differently, or that the Department would take a different view of cryptocurrency's risks, if ForUsAll's relief were granted.

*See Renal Physicians*, 489 F.3d at 1277-78 (redressability prong not satisfied where invalidation of government action based on APA procedural grounds was unlikely to change third-party behavior); *Cty. of Delaware v. Dep't of Transp*, 554 F.3d 143, 149-50 (D.C. Cir. 2009) (similar).

*Ciox Health* and *Sierra Club v. Mainella*, 2005 WL 3276264 (D.D.C. Sept. 1, 2005), are not to the contrary. In those cases, there was no unchallenged statutory provision that would continue to govern the regulated parties' behavior. Plaintiffs in those cases, moreover, were challenging further interpretations of promulgated regulations, *see Ciox Health*, 435 F. Supp. 3d at 44, 52 (guidance interpreting 2013 Privacy Rule); *Sierra Club*, 2005 WL 3276264, at *2-3 (guidance interpreting 36 C.F.R. § 9.32(e)), or the agency's substantive authority, *see Ciox Health*, 435 F. Supp. 3d at 44 (alleging agency acted *ultra vires*). Neither is true here, and the continued existence of statutory fiduciary duties in this instance dramatically undercuts any suggestion that the plans would feel freer to proceed with offering cryptocurrency investment options absent the Release in ways that the plaintiffs in *Ciox Health* and *Sierra Club* would.

Finally, ForUsAll suggests that Defendants question the Court's authority to interpret the law in a particular case. Opp. at 15. That is nonsense. Defendants noted in the motion (at 16), as explained above, that ERISA imposes a duty of prudence and authorizes the Department to investigate and bring enforcement actions. The Department has identified significant risks and challenges that accompany cryptocurrency investment options, *see* Release at 2-3, and based on its concerns, the Department has announced that it will be monitoring how plans provide such investment options, *id.* at

3. Those are quintessential policy judgments for the Executive Branch—not the Court—to make. *See Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."). And contrary to ForUsAll's opposition (at 15), that is precisely the point made in *Massachusetts v. Mellon*, 262 U.S. 447, 488-89 (1923), and many subsequent cases. Because ForUsAll does not contend that the Constitution or federal law prohibits the Department from assessing the risks of cryptocurrency and communicating them to plan fiduciaries, the Court lacks authority to direct the agency to take a different view, which in the end appears to be the heart of ForUsAll's request for relief.

## II.   THE RELEASE IS NOT REVIEWABLE FINAL AGENCY ACTION.

The parties agree that two prerequisites must be present for the Release to constitute final agency action under 5 U.S.C. § 704: (1) it must "mark the 'consummation'" of the Department's process and be not "merely tentative or interlocutory [in] nature"; and (2) it must determine "rights or obligations," or have "legal consequences" flow from it. Mot. at 18 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *accord* Opp. at 16, 18. Defendants have demonstrated, with respect to the Release, that neither is present, Mot. at 18-24, and thus, the Release is unreviewable. ForUsAll's contrary position is wrong.

### A.   The Release is not the consummation of the Department's process.

As explained in the motion (at 18-20), the first *Bennett* requirement is not satisfied because the Release takes no definitive position and bears none of the hallmarks of final agency action. ForUsAll disputes these points, but its arguments do not withstand scrutiny.

10

To start, ForUsAll incorrectly claims that the Release takes "a definitive position" on two points: (1) that there is "a new standard of care, 'extreme care,' applicable only to cryptocurrency"; and (2) that there is "an obligation to monitor investments in 'brokerage windows' also applicable only to cryptocurrency." Opp. at 18. The text of the Release shows neither to be true. In the Release's first paragraph, it states that "[t]he Department cautions plan fiduciaries to exercise extreme care before they consider adding a cryptocurrency option to a 401(k) plan's investment menu for plan participants." Release at 1. "Extreme care," in that context, is merely colloquial usage in an educational document urging fiduciaries to do their due diligence as ERISA already requires. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring fiduciaries to act with appropriate "care, skill, prudence, and diligence"). Indeed, in the next paragraph, the Release summarizes statutory provisions and recites well-worn phrases that courts have used to describe the ERISA-imposed fiduciary duties.[2] The Release does not suggest anywhere that anything but the ordinary duty of prudence applies, and it certainly does not state that there is a special cryptocurrency regime, as ForUsAll contends.

---

[2] *Compare* Release at 1 *with* 29 U.S.C. §§ 1104(a)(1) ("a fiduciary shall discharge his duties … solely in the interest of the [plan] participants and beneficiaries"), *id.* § 1104(a)(1)(B) ("a fiduciary shall discharge his duties … with the care, skill, prudence, and diligence" of a "prudent man"), *id.* § 1109(a) (establishing personal liability for breach of fiduciary duty); *Tibble*, 575 U.S. at 529 (duty of prudence includes duty to monitor investments and remove imprudent ones); *Stegemann v. Gannett Co.*, 970 F.3d 465, 469 (4th Cir. 2020) ("Courts have often called these fiduciary duties the 'highest known to the law.'") (quoting *Schweitzer v. Inv. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 194 (5th Cir. 2020)).

ForUsAll's claims regarding "brokerage windows" are even more far-fetched. The end of the Release states that "[t]he plan fiduciaries responsible for overseeing such investment options or allowing such investments through brokerage windows should expect to be questioned about how they can square their actions with their duties of prudence and loyalty in light of the risks described above." Release at 3. All that sentence says is that some fiduciaries (including those who allow investments in cryptocurrency through brokerage windows) may be asked how their decision to do so fits with their duty of prudence. It does not say that any class of investments must be monitored; that allowing investments in cryptocurrency violates a fiduciary duty; or that the Department will initiate an enforcement proceeding on that basis.

Further, comparing these so-called "definitive positions" with ForUsAll's cited cases shows just how unpersuasive these claims are. In *United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016), the Court concluded that an approved jurisdictional determination (the agency action at issue), which "stat[es] the presence or absence" of waters of the United States on a particular parcel of land after a significant fact-finding process, was a definitive ruling that satisfied *Bennett*'s first pong. *Id.* at 595, 598. No comparable fact- or plan-specific investigation was conducted—nor any finding rendered—with the Release. *Compare* Opp. at 17. In *Frozen Food Express v. United States*, 351 U.S. 40, 43 (1956), the government decided that certain commodities were not exempt agricultural products; here, the Release offers no commentary on specific investment vehicles or plans, and even as to cryptocurrency more generally, it merely expresses concern, identifies risks, and contemplates further investigation, *Release* at 2-3. Finally, in

*Ciox Health*, the challenged guidance "expresse[d] the agency's view, in categorical terms, as to what costs are covered by the Patient Rate." 435 F. Supp. 3d at 61; *see Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (similar). No such specificity or categorical decree is present here.

ForUsAll also contends that the Release bears the hallmarks of final agency action because it was issued in EBSA's name by the then-Acting Assistant Secretary of Labor and sets forth, in various places, "the Department's" concerns. Opp. at 16-17. However, ForUsAll once again ignores the Release's actual language, *see* Release at 3 (expressly contemplating further investigations), and confuses a few factors among many as determinative. As noted in the motion (at 20), the Release was not published in the Federal Register. The Department has not treated the Release as if it were a legislative rule; there is no allegation that field offices are treating the Release as controlling or that any enforcement action has been predicated on the Release. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). While none of these factors is necessarily dispositive, when combined with the fact that the Release does not take a definitive position and contemplates further agency action, they show that the first *Bennett* prong has not been satisfied.

### B.     The Release does not create legal consequences.

The second *Bennett* prong is also not satisfied because the Department has not held out the Release as binding, nor does the Release actually bind the Department or private parties. Mot. at 20-24. ForUsAll's attempts at rebuttal are contrary to precedent and common sense.

*First*, ForUsAll asserts that the Release stakes out two new legal positions—a different standard of care with respect to cryptocurrency and a new monitoring obligation with respect to brokerage windows. Opp. at 18-20. As explained above, *see* pp. 11-12, *supra*, these contentions are contrary to the plain language of the Release and simply not present in the document. Regardless, ForUsAll offers no explanation as to how an "extreme care" standard deviates from the ordinary duty of prudence—a duty among "the 'highest known to the law.'" *Stegemann v. Gannett Co.*, 970 F.3d 465, 469 (4th Cir. 2020). Absent some explanation or differential enforcement, there is no conflict and no new ground broken—even assuming the Release says what ForUsAll claims.

As for ForUsAll's argument regarding brokerage windows, it simply misstates the current law, documents it purports to quote in the complaint, and statements from Department officials. According to ForUsAll, "the Department's own longstanding regulations provide that the 'duty to prudently select and monitor' investments applies to 'designated investment alternatives' included on the plan's menu of investment options, but does not extend to investments that are only available to participants if they opt in to use of a brokerage window." Opp. at 5 (citing Compl. ¶¶ 20-21; 29 C.F.R. § 2550.404a-5(f), (h)(4)).[3] That is inaccurate: courts have found that the Department has not declared brokerage windows a duty-free zone. *See, e.g.*, *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 207 (D. Mass. 2020) ("in the absence of other regulations explicitly imposing

---

[3] ForUsAll suggests, in the alternative, that the Department has agreed with this statement. *See* Opp. at 28. That is incorrect. As explained above, the Department's regulations do *not* and have *not* stated that the duty of prudence does not extend to brokerage windows.

such a duty, [the Court] is hesitant to state unequivocally that there either is, or is not, a fiduciary responsibility to monitor self-directed brokerage accounts"); *cf. Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 799 (D. Minn. 2018) (finding that "Defendants may have breached their fiduciary duty in allowing Fidelity to select specific Fidelity retail funds to include in the Plan over identical, but lower-cost, K asset class funds").[4]

      Moreover, contrary to ForUsAll's contentions (at 19), neither the Release nor Department officials have stated that a special rule applies to cryptocurrency investment options in brokerage windows. ForUsAll purports to quote EBSA's Chief Operating Officer as "denying that the Department 'has imposed [an] obligation' 'to monitor *all of the investments* participants can access.'" Opp. at 19 (quoting Compl. ¶ 43). The article from which this "quote" was lifted, however, does not actually quote the COO making this distinction between cryptocurrency and other investments in a brokerage window. *See* Rebecca Rainey & Austin R. Ramsey, *Punching In: Whiling Away Time at DOL's Wage and Hour Division*, Bloomberg Law (Apr. 18, 2022).[5] In fact, when the *reporter* presented *plan sponsors*' concerns that they would "have to monitor all of the investments

---

[4] ForUsAll also alleges that the Advisory Council on Employee Welfare and Pension Benefit Plans "reported to Secretary Walsh that … DOL regulations say there is no such obligation [to monitor brokerage windows]" and that "fiduciaries do not currently engage in such monitoring." Compl. ¶ 6(a). That too is incorrect. The Council's advisory report noted that some interpret certain regulations to "suggest that no such obligation applies if investments are unrestricted," but expressly took note of *Moitoso. Understanding Brokerage Windows in Self-Directed Retirement Plans*, at 9-10 (Dec. 2021), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2021-understanding-brokerage-windows-in-self-directed-retirement-plans.pdf.

[5] Available at https://news.bloomberglaw.com/daily-labor-report/punching-in-whiling-away-time-at-dols-wage-and-hour-division (last updated Apr. 18, 2022).

participants can access," the COO was quoted as stating, "We haven't imposed that kind of obligation. It's much more about giving clear notice that fiduciaries need to be very careful … [and] make sure they're looking out for plan participants." *Id.*[6] In short, the Department—through the Release or otherwise—has not taken the position that different rules apply to cryptocurrency besides the basic background fiduciary duties of prudence and loyalty.

*Second*, ForUsAll contends that the Release holds itself out as having legal consequences because it "make[s] pronouncements in mandatory terms" and does not include boilerplate language disclaiming it has the force of law. Opp. at 20 n.9, 22. To start, ForUsAll's example of "mandatory" language—the Release stating that fiduciaries "will have to include in their analysis how regulatory requirements may apply to issuance, investments, trading, or other activities and how those regulatory requirements might affect investments by participants in 401(k) plans," Release at 3—is wholly unremarkable. Here again, the Release is just restating basic principles: fiduciaries must act diligently, including by knowing the "[r]ules and regulations governing the

---

[6] ForUsAll similarly conflates a reporter's paraphrase or interpretation of the then-Acting Assistant Secretary's statements when quoting an April 22, 2022 Law360 article. Opp. at 19. Mr. Khawar was not quoted as stating, "plan sponsors should consider the brokerage window reference in the context of a compliance assistance release focused on cryptocurrency"; those are the reporter's words. Kellie Mejdrich, *Under Fire From Biz Groups, DOL Stands By Crypto Guidance*, Law360 (Apr. 22, 2022), https://www.law360.com/articles/1486578 ("Law360 Article"). Mr. Khawar simply stated that it has been approximately 10 years since the Department "opined in any particular way on what exactly those fiduciary obligations look like in the context of brokerage windows" and that, most recently, the Department has said "don't assume that you're entering a safe house or something like that." *Id*. None of these statements suggest that different rules apply for cryptocurrency.

cryptocurrency markets" (or any other market, for that matter), so that the plan and its participants are not unduly exposed to risk. *Id.* That requirement would exist absent issuance of the Release. *See* 29 U.S.C. § 1104(a)(1)(B); *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741 (2022).

The omission of boilerplate language stating that the Release does not have the force of law is likewise a red herring. *See* Opp. at 22. While ForUsAll reads *National Mining Association v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014), to hold that the inclusion or omission of the boilerplate disclaimer is determinative, *see* Opp. at 22, *National Mining* actually recognizes that the boilerplate language is just one consideration and that the Court looks to "the document as a whole." 758 F.3d at 252. If the "guidance" "reads like a ukase" and "commands," "requires," "orders," and "dictates," then it may be a legislative rule and, thus, final agency action despite the disclaimer, as was the case in *Appalachian Power*, 208 F.3d at 1023. But the omission of such boilerplate—when the Release itself does not "read[] like a ukase," *see supra*—does not automatically turn mere guidance into final agency action under D.C. Circuit precedent. Moreover, the omission of such boilerplate here (when such language was included in Compliance Assistance Release No. 2021-01) is a function of the change in Departmental procedural rules, rather than a signal of binding intent. On August 28, 2020, the Department promulgated a final rule implementing former President Trump's Executive Order 13891. *Promoting Regulatory Openness Through Good Guidance (PRO Good Guidance)*, 85 Fed. Reg. 53,163 (Aug. 28, 2020). That regulation required the Department to append the boilerplate language to any guidance, 85 Fed. Reg. at 53,171, but was rescinded on January 27, 2021,

*see Rescission of Department of Labor Rule on Guidance*, 86 Fed. Reg. 7,237 (Jan. 27, 2021), *amending* 29 C.F.R. Part 89. The Release omits the language one prior release included because the boilerplate was no longer mandatory.

*Third*, ForUsAll claims that the Release has direct and appreciable legal consequences because "plan fiduciaries are not 'free to completely ignore' the Release 'with total impunity.'" Opp. at 21. But ForUsAll does not identify what those legal consequences are. For instance, it does not explain how the Release would bind Department decisionmakers going forward when it does not purport to find certain offerings are or are not prudent, *cf. Hawkes*, 578 U.S. at 598-99 (noting that the agency action binds the government for five years and prevents it from imposing civil liability for past violations), or how it "withdraws" Department discretion, *cf. POET Biorefining, LLC v. EPA*, 970 F.3d 392, 405 (D.C. Cir. 2020). Nor does it explain how a regulated entity is "expose[d] … to the possibility of an enforcement action or to enhanced fines or penalties" that it was not before under the statute. *Cf. Valero Energy Corp.*, 927 F.3d 532, 536 (D.C. Cir. 2019). Nor does ForUsAll point to any instance in which the Department has applied the Release as if it were binding. *Nat'l Mining Ass'n*, 758 F.3d at 253. All that ForUsAll points to is the alleged reactions of some number of plans to the Release as evidence that the Release has legal consequences, Opp. at 21, but the fact that those plans acted — when two-thirds in ForUsAll's sample did not — is insufficient. *Nat'l Mining Ass'n*, 758 F.3d at 253. The point is: the Release does not compel them to do anything that their

fiduciary duties did not demand of them already.[7] Accordingly, the Release does not create direct and appreciable legal consequences, and it is not final agency action.

### III.   NOTICE AND COMMENT WAS UNNECESSARY BEFORE ISSUING THE RELEASE.

Defendants' motion demonstrated (at 24-26) that, even if ForUsAll has standing and the Release constitutes final agency action (neither of which is true), Count I of the complaint should be dismissed because, at most, the Release is an interpretative rule that does not require notice and comment. ForUsAll disagrees based on its claims that (1) the Release adopted a new legal position as to brokerage windows, Opp. at 23-25, (2) the Department rejected notice-and-comment rulemaking, *id.* at 24, and (3) the Department has refused to withdraw the Release and instead intends to initiate investigations based upon it, *id.* at 26-27. Defendants address the first claim above at length, *see* pp. 11-12, 14-16, *supra*, and will not belabor their points further. The second and third lack merit.

ForUsAll's assertion that the Department stated that it decided against undertaking notice and comment due to "political expedience" is simply not supported by the articles it cites. *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must

---

[7] Defendants noted in the motion (at 23) that the Release contemplates plan-specific investigations and that, in the context of those investigations, the Department could reach a decision whether offering a particular investment option was prudent under the circumstances. ForUsAll seems to disagree that such a definitive position is necessary for the Department's action to be final. Opp. at 22-23. But absent a finding that certain conduct violates—or does not violate—the duty of prudence, it is unclear how the Release does anything other than "leave[] the world just as it found it." *Valero*, 927 F.3d at 536. Plan fiduciaries are free to offer cryptocurrency investment vehicles that comply with their obligations, including the duty of prudence, and to raise any defense to an enforcement action that was available prior to issuance of the Release; the Department similarly would need to be prepared to justify any action without reference to the Release. *Nat'l Mining Ass'n*, 758 F.3d at 253.

we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."). Paragraph 41 purports to quote two trade press articles in which the then-Acting Assistant Secretary supposedly "admitted" that "the Department deliberately circumvented the APA's rulemaking requirements in order to front-run the whole-of-government approach to cryptocurrency regulation laid out in the Executive Order."[8] The only reference to notice-and-comment rulemaking in the first article—the April 22, 2022 Law360 article discussed above—was with respect to an assertion made by business groups that the Release created a new fiduciary standard. In response, Mr. Khawar was quoted as stating that the Release did not represent a "sea change" and was "not inconsistent with what [the Department has] said before," and he explained that EBSA created the guidance in light of "Superbowl commercials … actively encouraging [people] to put their tax-advantaged retirement dollars in [cryptocurrency]." Law 360 Article. None of those statements indicates that any "agency

---

[8] Executive Order No. 14067 acknowledges that cryptocurrency may "present disparate financial risk to less informed market participants" and places "protect[ing] consumers, investors, and businesses in the United States' as its first policy objective, 87 Fed. Reg. 14143, 14143, 14147 (Mar. 9, 2022); *see* Mot. at 5. ForUsAll nevertheless maintains that the Release is somehow out of step with the Administration's approach to cryptocurrency. *See, e.g.*, Opp. at 3, 4 n.2; Compl. ¶¶ 36-41. That is incorrect. Indeed, a recent Department of Treasury report produced in response to Executive Order No. 14067 highlights the Release as an appropriate means of "address[ing] current and emerging risks in crypto-asset intermediation." Dep't of Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* at 40-41 (Sept. 2022), https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf. In any event, Executive Order No. 14067 "does not[] create any right or benefit … enforceable at law or in equity by any party against the United States." 87 Fed Reg. 14152.

official" believed notice-and-comment procedures were appropriate or purposefully evaded. *Cf. Comm. for Fairness v. Kemp*, 791 F. Supp. 888, 895 & n.25 (D.D.C. 1992).

ForUsAll's citation to the second article again wrongfully conflates the reporter's paraphrasing of Mr. Khawar with his actual statements. Compl. ¶ 41 (quoting Brian Croce, *DOL's Khawar Discusses Fidelity's Crypto Offering, ESG Proposal*, Pensions & Investments (May 19, 2022)). The quoted language in the complaint regarding "a standard rule-making process—which takes at least months and potentially years" is the reporter's language—and not supposedly a quote from Mr. Khawar. And again, nothing in that article suggests that Mr. Khawar or any other Department official believed the guidance should have proceeded through notice and comment or that those processes were improperly evaded. *Cf. Comm. for Fairness*, 791 F. Supp. at 895 & n.25. Because these allegations conflict with the incorporated press articles, they do not support a finding that notice and comment was necessary here and should be ignored.

Finally, ForUsAll accuses Defendants of having "a remarkable degree of chutzpah" to suggest that the Release is at most an interpretative rule when, on its reading, the Department supposedly "inten[ds] to rely on the Release as a basis for initiating investigations." Opp. at 26. The language of the Release block-quoted immediately below ForUsAll's assertion contradicts this claim. *See id.* The Release states that EBSA "expects to conduct an investigative program" "[b]ased on the[] … concerns" identified in the Release—not that any investigative program will seek to enforce the Release itself. Release at 3. The authority to investigate and enforce statutory fiduciary duties comes, unsurprisingly, from the statute. 29 U.S.C. §§ 1104, 1132, 1134. Indeed, the

last sentence of the Release informs plan fiduciaries that EBSA will seek to understand how the fiduciaries' actions square with those statutory duties, which EBSA references earlier in the Release. *See* Release at 1, 3.

*      *      *

Providing plan fiduciaries and the broader public with information regarding the Department's concerns, particularly when those concerns touch on Americans' retirement savings, improves transparency and furthers ERISA's purpose of protecting plan participants. That EBSA and the Department more broadly stand by these efforts does not impact whether the Release is a legislative or interpretative rule. *See* Opp. at 27. Because the Release in substance is not a legislative rule, Count I should be dismissed.[9]

## CONCLUSION

For the reasons above, and those stated in the motion to dismiss, this action should be dismissed for lack of subject-matter jurisdiction or for failure to state a claim.

---

[9] ForUsAll suggests that the Court's Mediation Program or the Court's assistance in working out a stipulation that addresses certain points may be beneficial. Opp. at 28 n.14. At this time, Defendants do not believe such efforts would bear fruit.

Dated: October 20, 2022                Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       BRAD P. ROSENBERG
                                       Assistant Branch Director

                                       */s/ Christopher A. Eiswerth*
                                       Christopher A. Eiswerth (D.C. Bar No. 1029490)
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW, Rm. 12310
                                       Washington, DC 20005
                                       Tel: (202) 305-0568
                                       Email: christopher.a.eiswerth@usdoj.gov

                                       *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing document with the Clerk of the Court through the CM/ECF system on October 20, 2022. This system provided a copy to and effected service of this document to all parties.

/s/ Christopher A. Eiswerth

CHRISTOPHER A. EISWERTH
Trial Attorney (DC Bar #1029490)
United States Department of Justice
Civil Division, Federal Programs Branch