**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FORUSALL, INC.,** | |
| Plaintiff, | |
| v. | Case No. 22-cv-1551 (CRC) |
| **UNITED STATES DEPARTMENT OF LABOR**, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Last year, the Department of Labor ("Department") issued a Compliance Assistance Release that questioned the prudence of exposing 401(k) plan participants to investments in crytpocurrencies and reminded retirement plan sponsors of their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq.  Plaintiff ForUsAll, Inc., which provides administrative and other services to retirement plans, claims that this Release harmed its pocketbook by prompting retirement plans to back out of discussions about partnering with ForUsAll to provide plan participants access to cryptocurrency investment options.  Bringing this action under the Administrative Procedure Act ("APA"), 60 Stat. 237, as amended, 5 U.S.C. § 500 et seq., ForUsAll seeks a declaration that the Release was unlawful, an order vacating and setting it aside, and an injunction preventing the Department from applying it in any manner.  None of this requested relief, however, appears likely to redress ForUsAll's alleged injury because ForUsAll fails to show that these actions would cause the third-party fiduciaries to renew their discussions or enter into the contemplated partnerships.  Nor is the Release final agency action subject to judicial review.  For these two reasons, the Court grants the Department's motion to dismiss.

I.     **Background**

A.  <u>Legal Background</u>

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans," including retirement plans.  <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 90 (1983); <u>see also</u> 29 U.S.C. § 1101(a).  To achieve this objective, ERISA "imposes participation, funding, and vesting requirements" on covered plans and "also sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility."  <u>Shaw</u>, 463 U.S. at 91.

Fiduciary responsibilities serve a central role in this statutory scheme by ensuring that plan providers operate in participants' best interests.  ERISA casts a wide net and imposes these fiduciary responsibilities not only on "named fiduciaries" of an employee benefit, <u>see</u> 29 U.S.C. § 1102(a), but on all actors who "render[] investment advice for a fee or other compensation" or have "any discretionary authority or discretionary responsibility in the administration of such plan," <u>id.</u> § 1002(21)(A).  Each of these fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  <u>Id.</u> § 1104(a)(1)(B).  These duties are "derived from the common law of trusts," <u>Tibble v. Edison Int'l</u>, 575 U.S. 523, 528 (2015) (citation omitted), and courts "have often called [them] the highest known to the law."  <u>Stegemann v. Gannett Co.</u>, 970 F.3d 465, 469 (4th Cir. 2020) (citation and quotation marks omitted).  Particularly relevant here, fiduciaries have a "duty to exercise prudence in selecting investments at the outset" as well as "a continuing duty to monitor trust investments and remove imprudent ones."  <u>Tibble</u>, 575 U.S. at 529.

How these duties play out in practice depends on the employee benefit plan in question. Employee retirement plans come in two forms. Defined-benefit plans operate like traditional pension plans and pay out from an account that the participating employee does not control. See 29 U.S.C. § 1002(35). Defined-contribution plans, by contrast, allow "participating employees [to] maintain individual investment accounts, which are funded by pretax contributions from the employees' salaries and, where applicable, matching contributions from the employer." Hughes v. Nw. Univ., 142 S. Ct. 737, 740 (2022); see also 29 U.S.C. § 1002(34). "Each participant chooses how to invest her funds . . . from the menu of options selected by the plan [fiduciaries]," and the "performance of her chosen investments, as well as the deduction of any associated fees, determines the amount of money the participant will have saved for retirement." Hughes, 142 S. Ct. at 740. Providers of defined-contribution plans must "conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." Id. at 742.

Whether any similar duties apply to investment options that plan providers offer through "brokerage windows" is less settled. "A brokerage window allows participants to invest their account balances held within a self-directed retirement plan in a variety of investments beyond the menu of designated investment alternatives offered directly by the plan." Advisory Council on Emp. Welfare & Pension Benefit Plans, Understanding Brokerage Windows in Self-Directed Retirement Plans 7 (2021), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2021-understanding-brokerage-windows-in-self-directed-retirement-plans.pdf. Plan providers, of course, "*may* restrict the types of investment options or even exclude specific investments within a type of investment option" offered through their brokerage windows. Id. (emphasis added). But the Labor Department has wavered on whether they have

any affirmative obligation to do so, see id. at 8, leaving that question unanswered for now, see

Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 207 (D. Mass. 2020) ("[I]n the absence of other

regulations explicitly imposing such a duty, [the court] is hesitant to state unequivocally that

there either is, or is not, a fiduciary responsibility to monitor self-directed brokerage accounts.");

but see Understanding Brokerage Windows, supra at 47 (advising that, "except perhaps in

extraordinary circumstances," there is no duty to monitor the brokerage windows).

If a plan fiduciary breaches its duties, plan participants may sue to "recover benefits due

to [them] under the terms of [the] plan, to enforce [their] rights under the terms of the plan, or to

clarify [their] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

The Secretary of Labor also has the power to initiate civil actions against entities for breaching

their duties.  See id. § 1132(a)(2).  Additionally, the Secretary is authorized to investigate plan

providers to ensure their compliance with ERISA.  See id. § 1134(a).

B.  Factual and Procedural Background

In March 2022, President Biden issued Executive Order No. 14067 in response to the

dramatic rise of digital assets, such as cryptocurrencies.  See Exec. Order No. 14067, Ensuring

Responsible Development of Digital Assets, 87 Fed. Reg. 14143 (Mar. 9, 2022).  The Executive

Order declared that the United States government "must take strong steps to reduce the risks that

digital assets could pose to consumers, investors, and business protections" and advised agencies

to take appropriate actions to regulate the industry.  Id. at 14143.

That same month, the Labor Department's Employee Benefits Security Administration

("EBSA") issued a Compliance Assistance Release entitled "401(k) Plan Investments in

'Cryptocurrencies.'"  See Mot. to Dismiss, Ex. A at 1.  The Release "caution[ed] plan fiduciaries

to exercise extreme care before they consider adding a cryptocurrency option to a 401(k) plan's

investment menu for plan participants." Id. at 1.  The Release then identified several reasons why such caution was warranted in this area.  In particular, the Release expressed concerns about cryptocurrency investments' "[e]xtreme volatility" due to "the many uncertainties associated with valuing these assets, speculative conduct, the amount of fictitious trading reported, [and] widely published incidents of theft and fraud."  Id. at 2.  It also commented on the significant regulatory risks, observing that "[r]ules and regulations governing the cryptocurrency markets may be evolving" and cautioning that "some market participants may be operating outside of existing regulatory frameworks or not complying with them."  Id. at 3.  On top of these market and regulatory uncertainties, the Release warned that plan participants enticed by the "hype" and "potential for outsized profits" may not have "sufficient knowledge about these investments." Id. at 2.  Under these conditions, EBSA cautioned that fiduciaries may "lead plan participants astray and cause losses" by offering cryptocurrency options and thereby "effectively tell[ing] the plan's participants that knowledgeable investment experts have approved the cryptocurrency option as a prudent option for plan participants."  Id. at 2.  The Release concluded by notifying plans that the Department "expects to conduct an investigative program" into cryptocurrency investments and intends "to take appropriate action to protect the interests of plan participants and beneficiaries with respect to these investments" and by remarking that fiduciaries "responsible for overseeing such investment options or allowing such investments through brokerage windows should expect to be questioned about how they can square their actions with their duties of prudence and loyalty in light of the risks described above."  Id. at 3.

Three months later, ForUsAll filed suit against the Department and Secretary of Labor Martin Walsh in his official capacity.  The complaint alleges that ForUsAll is in the business of providing "administrative and other services to retirement plans" and that it "was the first

company to announce that it would make cryptocurrency available to 401(k) plan participants through a self-directed window."  Compl. ¶ 11.  It further asserts that a number of plans "had already agreed to add cryptocurrency through ForUsAll's program prior to the Release" but that, while "the majority of plans remain interested" in these partnerships, "approximately one-third of the plans ForUsAll has discussed the matter with have indicated that, despite their interest in including cryptocurrency, they do not intend to proceed at this time in light of Defendants' enforcement threats."  Id. ¶ 50.

Seeking to remedy these alleged financial losses, ForUsAll contends that the Release violates two APA provisions.  It asserts that the Department violated 5 U.S.C. § 553 by issuing the Release without first going through the notice-and-comment process.  Id. ¶ 52.  It also contends that the Department violated 5 U.S.C. § 706 by acting in an arbitrary and capricious manner and in excess of its authority when, among other things, it jettisoned the applicable duty of prudence in favor of a special "extreme care" standard for cryptocurrency and inaccurately suggested that plans' fiduciary duties extend to their selection and monitoring of cryptocurrency investments offered through brokerage windows.  Id. ¶¶ 57–61.  In terms of relief, ForUsAll asks that the Court declare the Release unlawful, vacate and set it aside, enjoin the Department from "implementing, applying, or taking any action under, based on, or in furtherance" of it, and reiterate that the Department's "investigatory authority is limited to investigating violations of Title I of ERISA, and may not be used . . . to seek adherence to substantive rules that it has not set forth in regulatory guidance."  Id. ¶ 63.

The Department responded by filing a motion to dismiss the complaint on two grounds. First, the Department contends that ForUsAll lacks standing to challenge the Release because it failed to allege facts showing that the Release caused its purported loss of business opportunities

or that the requested relief would remedy this alleged injury.  Mot. to Dismiss at 10.  The Department thus argues that the Court must dismiss the claims under Federal Rule of Civil Procedure 12(b)(1).  Second, the Department maintains that the Release is not final agency action that can be challenged under 5 U.S.C. § 704 and that the Court therefore should dismiss the complaint under Rule 12(b)(6) for failure to state a claim.  Id. at 18.

## II.   Legal Standards

When analyzing a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), a court "must treat the complaint's factual allegations as true, and [it] must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and quotation marks omitted).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  Because standing is a jurisdictional matter, the complaint must plausibly claim that "the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."  Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015).  "[T]he court may consider documents outside the pleadings to assure itself that it has jurisdiction."  Sandoval v. U.S. Dep't of Justice, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ramirez v. Blinken, 594 F. Supp. 3d 76, 85 (D.D.C. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  Although a court must accept all well-pleaded factual allegations, it need not accept legal conclusions.  Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  "In determining

7

whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.   Analysis

ForUsAll fails to meet its burden of demonstrating its standing to proceed in this Court and, regardless, has not stated a cognizable claim. ForUsAll lacks standing because it is highly speculative that the requested relief would redress the alleged injuries to its business. Its APA claims also falter at the outset because the Release is not a final agency action and is therefore unreviewable. The Court explains why below.

### A.   Standing

To establish Article III standing to sue, a plaintiff must plausibly allege that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The latter two requirements are "substantially more difficult to establish" where, as here, "a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court." Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004) (citation and quotation marks omitted). In these types of cases, a plaintiff typically must present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." Id. at 941. ForUsAll has failed to meet that burden here.

Accepting its allegations as true, ForUsAll suffered a concrete financial injury when several plans backed out of discussions to use ForUsAll's services in offering plan participants

access to cryptocurrency investment options. Yet the Department contends that this injury is not traceable to the Release nor redressable by the requested relief. The Court agrees in part. Although ForUsAll adequately alleged that the retirement plans terminated their discussions because of the Release, there is not a reasonable basis for believing that the requested declaratory and injunctive relief would restart those negotiations and thereby cure the alleged injury. Without the power to provide effective relief, the Court must dismiss all claims.

      *1.   Causation*

As an initial matter, the Department is incorrect when it contends that ForUsAll failed to adequately allege that the Release caused its financial loss because it was the result of the third-party plan's independent decisions to back out of their would-be partnerships. To be sure, a plaintiff must show that its injury "fairly can be traced to the challenged action of the defendants, and [is] not injury that results from the independent action of some third party not before the court." Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 41–42 (1976). But an alleged "causation chain does not fail solely because there are several links" or because third parties intervened. Maya v. Centex Corp., 658 F.3d 1060, 1070 (9th Cir. 2011) (citation and quotation marks omitted). The plaintiff's burden is only to show that the defendant's actions were a "substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries." Nat'l Wrestling, 366 F.3d at 941.

ForUsAll has met this challenge at the pleading stage. As noted above, the complaint states that "approximately one-third of the plans ForUsAll has discussed the matter with have indicated that, despite their interest in including cryptocurrency, they do not intend to proceed at this time in light of Defendants' enforcement threats." Compl. ¶ 50. This passage clearly and concretely alleges that the Department's issuance of the Release—which reasonably can be

construed as threatening investigation and possible enforcement action against plans that offer cryptocurrency investment options—was a "substantial factor" behind the third parties' decisions to discontinue their discussions with ForUsAll about offering cryptocurrency investments.  It would be improper at this stage for the Court to doubt this factual allegation, which is "specific, plausible, and susceptible to proof at trial."  Osborn v. Visa Inc., 797 F.3d 1057, 1066 (D.C. Cir. 2015).  In fact, courts routinely hold that similar allegations of direct and reasonable third-party responses to threatened government action suffice for standing purposes at the pleading stage. See, e.g., Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC, 132 F. Supp. 3d 98, 111 (D.D.C. 2015) (determining that the plaintiffs had standing at the pleading stage based on loss of business relationships allegedly resulting from FDIC pressure on banks to cut ties with payday lenders).

Establishing causation, however, does not get a plaintiff a ticket to federal court. ForUsAll still must clear the hurdle of demonstrating that this Court can provide adequate relief. It is there that ForUsAll stumbles.

### 2.  Redressability

A plaintiff is required to show there is a "substantial likelihood" that the requested relief will remedy its injury.  Id. at 111 (citations omitted).  Although causation and redressability oftentimes travel hand-in-hand, they can also go their separate ways.  That is because "[t]here might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces."  Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs., 489 F.3d 1267, 1278 (D.C. Cir. 2007).  This is one of those cases.  Even if the Release prompted retirement plans to pull out of their potential partnerships with ForUsAll, it is entirely speculative that these plans would come back to the table if

ForUsAll received the relief that it is seeking.  See Nat'l Wrestling Coaches Ass'n, 366 F.3d at 938 ("[A] plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries.").  A tour through the requested relief shows why this is so.

ForUsAll requests that the Court declare that the Release is unlawful, set it aside, and vacate it.  It is hard to see how those actions would restore these business prospects, however, because they would not change the facts underlying the Release that caused ForUsAll's potential partners to cut and run in the first place.  The Release reminds retirement plans that they have fiduciary obligations to participants under ERISA, outlines a list of "significant risks and challenges" associated with cryptocurrency investments that the Department finds troubling, and alerts plans that the Department expects to conduct inquiries and investigations to ensure that these plans are complying with their duties when offering investment options in this area.  Mot. to Dismiss, Ex. A.  All of this would remain the same if the Court vacated the order.  Third-party plans would still have fiduciary duties to act with prudence under ERISA, and they would remain subject to possible investigations and enforcement actions by a Department that has expressed grave concerns about retirement plans offering investments in what it perceives as an overly risky market.  Without clear evidence to the contrary, it is hard to fathom how this relief would restore ForUsAll's lost business opportunities because it is doubtful that plan fiduciaries would disregard these lingering risks and partner with ForUsAll if the Release itself were no longer effective.  See Cmty. Fin. Servs. Ass'n of Am., 132 F. Supp. 3d at 115 (noting that, to prove redressability, a plaintiff must be "able to prove that injunctive relief would result in a substantial likelihood that [third-party businesses would] restore relationships or not terminate relationships in the future").

This case is thus meaningfully distinct from Ciox Health, LLC v. Azar, 435 F. Supp. 3d 30 (D.D.C. 2020), on which ForUsAll relies.  The plaintiffs in Ciox challenged Department of Health and Human Services ("HHS") rules and interpretations that purportedly altered the existing regulatory requirements and "all but ensure[d]" that plaintiff would be held liable for the transgressions of its business associates.  Id. at 49.  In this context, the court held that eliminating the rules and guidance would redress plaintiff's injury because, freed from these constraints, the plaintiff "could start recouping the los[s]es it presently incurs."  Id. at 52.  But that is not true here.  As discussed in detail below, the Release does not alter existing legal responsibilities. Removing it from the picture would not change the outlook, then, because the third-party plans would still see the same regulatory and financial risks if they partnered with ForUsAll.[1]

For similar reasons, the other requested relief fares no better.  An injunction barring the Department from "implementing, applying, or taking action under, based on, or in furtherance of the Release" would be entirely ineffective because, as just mentioned, the Department need not rely on the Release to exercise its authority to enforce the statutory-based duty of prudence that exists regardless.  See 29 U.S.C. § 1132(a)(1).  Nor would a declaration that the Department "is limited to investigating violations of Title I of ERISA," Compl. ¶ 63(d), which simply reiterates the law on the books.  In neither instance would the requested judgment likely spur retirement plans to change course.

---

[1]  ForUsAll also cites to Ciox Health for the proposition that the Court should not peek under the hood at this stage of the inquiry to assess the merits of its claim that the Release does change the plan fiduciaries' legal obligations.  See 435 F. Supp. 3d at 52 (insisting that whether the new regulations change the law "is a merits argument, and for purposes of standing, the court must assume the merits of Ciox's claims").  But the Court is not compelled to take ForUsAll's word on the matter or accept its legal conclusions.  See Browning, 292 F.3d at 242.  Regardless, for reasons discussed below, the fact that the Release does not alter legal obligations also dooms the APA claims because it indicates that the Release is not final agency action.

In this respect, this case resembles the situation the D.C. Circuit confronted in National Wrestling Coaches Association.  There, membership organizations representing men's wrestling teams challenged a Department of Education policy interpretation addressing how colleges could comply with Title IX.  See 366 F.3d at 933.  That policy interpretation noted that colleges could satisfy their obligations in a variety of ways, including by equalizing membership on men's and women's teams.  Id. at 935.  The plaintiffs claimed injury by asserting that colleges had responded to the interpretation by cutting the sizes of their men's wrestling teams, but the court concluded that they failed to show redressability because the plaintiffs "offer[ed] nothing but speculation to substantiate their claim that a favorable decision from [the] court will redress their injuries by altering these schools' independent decisions."  Id. at 936–37.  The Court found it "difficult to imagine" how eliminating the policy would restore the size of these men's wrestling teams given that Title IX's prohibition on sex discrimination would remain in place and that schools would likely continue to perceive a reduction of the men's wrestling team as a straightforward path to compliance that the Department of Education had greenlit.  Id. at 939–40.

Similarly, the court in Renal Physicians Association held that the plaintiffs did not satisfy the redressability requirement because vacating HHS's challenged safe-harbor provision would not negate the underlying legal obligations of third-party dialysis facilities and, as a result, likely would not alter their behavior.  489 F.3d at 1277–78.  "The effect of the safe-harbor provision has been to identify one relatively simple" way to comply with the law, the court reasoned, "and there [was] no reason to think [that HHS would] find this method of proof any less persuasive if the safe harbor [were] invalidated."  Id. at 1277.  "In short, the word [was] already out, and therefore it [was] too late to reverse course."  Id. at 1277–78.  And in Scenic America, Inc. v. United States Department of Transportation, the D.C. Circuit rejected the plaintiff's arguments

13

that vacating the challenged guidance allegedly "ma[king] it easier for states to erect" digital billboards would redress plaintiff's injury of increased expenditures fighting their construction because the States could decide to continue approving the same billboards in the same manner without the guidance given that the underlying legal obligations would remain.  836 F.3d 42, 50, 52–53 (D.C. Cir. 2016).  Particularly given the difficulty of establishing standing based on the actions of third parties not before it, the court concluded that the plaintiff's "lack of any evidentiary basis for its redressability contentions require[d the court] to reject [the plaintiff's] standing."  Id. at 53.

The logic behind these cases applies with equal force here.  Whether the Release stands or falls, retirement plans are unlikely to jump back into business with ForUsAll, at least on this score, because they will remain bound by fiduciary duties that will be enforced by a Department that is skeptical of cryptocurrency and likely to bring enforcement actions in this area.  Under these circumstances, and without evidence to the contrary, it is doubtful that any relief this Court could provide would repair ForUsAll's dashed business prospects.  ForUsAll therefore has failed to establish redressability and lacks standing to proceed.  But even if it did have standing, ForUsAll claims still fail because it cannot satisfy another requirement for maintaining this suit: a cause of action.

B.  Final Agency Action

Under the APA, federal courts may review only "final agency action[s]."  5 U.S.C. § 704.  Two conditions must be satisfied for agency action to be final.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154,

177–78 (1997) (citations and quotation marks omitted).  The Release fails to satisfy either of these requirements:  It neither marks the consummation of the Department's decisionmaking nor determines any entities' legal rights or obligations.  As a result, ForUsAll does not have a cause of action under the APA.[2]

### 1. *Prong 1: Consummation of Agency Decisionmaking*

"The consummation prong of the finality inquiry requires courts to determine whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue, or is, instead, only the ruling of a subordinate official, or tentative."  Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020) (citation and quotation marks omitted).  In making this determination, courts often assess how an agency subsequently treats the challenged action and whether there is any indication that the agency applied the guidance as if it bound regulated parties.  See, e.g., Sw. Airlines Co. v. U.S. Dep't of Transp., 832 F.3d 270, 275 (D.C. Cir. 2016) (collecting cases).  The Release does not satisfy these criteria because it was only the opening act, not the grand finale, of the Department's process of regulating the burgeoning cryptocurrency market.

The Release's language is instructive.  It "cautions plan fiduciaries to exercise extreme care" and expresses "serious concerns about the prudence of a fiduciary's decision to expose a 401(k) plan's participants to direct investments in cryptocurrencies."  Mot. to Dismiss, Ex. A at 1.  However, the Release does not declare that it violates fiduciary duties to offer cryptocurrency options either categorically or in any specific context.  Those decisions are deferred until later,

---

[2] Although the question of whether an action is final agency action is not jurisdictional, see Trudeau v. FTC, 456 F.3d 178, 183–84 (D.C. Cir. 2006), it is a "threshold question" that courts can decide without assuring their jurisdiction, see Toca Producers v. FERC, 411 F.3d 262, 265 n.* (D.C. Cir. 2005) (citation omitted).

distinguishing this case from <u>Ciox Health</u> where the challenged guidance "express[ed] the agency's view, in categorical terms, as to what costs are covered by the Patient Rate."  435 F. Supp. 3d at 61.  There is no similar categorical decree here.  Consistent with this more open-ended position, the Release explains that the Department "expects to conduct an investigative program" and alerts plan fiduciaries that they "should expect to be questioned about how they can square their actions with their duties of prudence and loyalty."  Mot. to Dismiss, Ex. A at 3. These remarks also suggest that the Department is beginning its evaluation, not ending discussion on the matter.  The statement that the Department will "take appropriate action to protect the interests" also does not indicate that any enforcement action is imminent or inevitable, <u>id.</u>, and courts have found that similar warning letters that *may* lead to enforcement action do not constitute final agency action, <u>see, e.g.</u>, <u>Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.</u>, 664 F.3d 940, 944 (D.C. Cir. 2012) (finding that warning letters that may lead to enforcement action but would not "inevitably" do so did not represent the consummation of the agency's decisionmaking process).

As this language makes clear, the Release does not bind regulated entities.  While it warns plan fiduciaries that it may be difficult to square offerings in cryptocurrency with their obligations under ERISA, it does not prevent these companies from taking a different view of the matter.  Indeed, some plans appear to have done just that by carrying on with their relationships with ForUsAll.  Compl. ¶ 50.  In its briefing, the Department has reiterated that the Release is advisory rather than binding.  <u>See</u> Mot. to Dismiss at 19; <u>Sw. Airlines Co.</u>, 832 F.3d at 275 (finding an agency's characterization of an action and subsequent notice that it would entertain arguments about the guidance showed that the action was not final).  Furthermore, nothing in the

complaint contradicts this representation or gives the Court reason to believe that, in practice, the Department has treated the Release as if it tied the hands of regulated entities.

ForUsAll's arguments to the contrary miss the mark.  It presumes that the Release must be the consummation of the Department's decisionmaking process because it purports to speak for "the Department" and was issued by the Acting Assistant Secretary of Labor.  These factors are no doubt relevant, see POET Biorefining, LLC v. EPA, 970 F.3d 392, 404–05 (D.C. Cir. 2020), but they are not determinative when, as here, other indicators suggest that the agency's position is "of a merely tentative or interlocutory nature" and requires further inquiry, Bennett, 520 U.S. at 178.  And, contrary to ForUsAll's contentions, the Secretary of Labor's off-the-cuff remark in an interview that the Department had issued "some rulings" about companies allowing workers to invest in cryptocurrency as part of their 401(k) plans does not transform the Release—if that is in fact what the Secretary was referencing—into something it is plainly not. See Transcript: The Technology 202: The Future Infrastructure Workforce, Wash. Post (May 19, 2022), https://www.washingtonpost.com/washington-post-live/2022/05/19/transcript-technology-202-future-infrastructure-workforce.  Finally, in a last-ditch effort to prove that the Release satisfies the first Bennett prong, ForUsAll asserts that the Release "break[s] new ground" by altering the rules governing cryptocurrency investments.  Opp'n at 18.  But this argument speaks directly to the second prong of the inquiry, to which the Court now turns.

2.  *Prong 2: Direct and Appreciable Legal Consequences*

The second prong of the Bennett test looks to the "actual legal effect (or lack thereof) of the agency action in question on regulated entities."  Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 252 (D.C. Cir. 2014).  "Whether an agency action has 'direct and appreciable legal consequences' . . . is a 'pragmatic' inquiry" that looks to its formal legal effect as well as the

agency's characterizations and any track record of applying the guidance as if it bound regulated parties. Sierra Club v. EPA, 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 599 (2016)).

No legal consequences flow from the Release here. The Release "does not tell regulated parties what they must do or may not do in order to avoid liability." McCarthy, 758 F.3d at 252. It does not "command[]," "require[]," "order[]," or "dictate[]" that plan fiduciaries refrain from offering cryptocurrency investment options or take any other action. Appalachian Power Co. v. EPA, 208 F.3d 1015, 1023 (D.C. Cir. 2000). Nor does the Release withdraw discretion from the Department going forward by compelling certain enforcement actions. See Hawkes Co., 578 U.S. at 598–99. It simply reminds plans of their duties under ERISA, describes the various risks associated with cryptocurrency investments, and communicates the Department's position in a manner that does not bind regulated entities or the agency. In this sense, the Release resembles the advice letter at issue in Independent Equipment Dealers Association v. EPA, 372 F.3d 420 (D.C. Cir. 2004), which the D.C. Circuit held did not satisfy Bennett's second prong because the letter "neither announced a new interpretation of the regulations nor effected a change in the regulations themselves," id. at 427. It was rather "purely informational in nature" and "[c]ompell[ed] no one to do anything" because it had "no binding effect whatsoever." Id. Similarly, the Circuit in Holistic Candlers held that FDA warning letters directing manufacturers to take prompt action to comply with their statutory obligations was not final agency action because they were an "informal and advisory" means of achieving "voluntary compliance" that did "not commit FDA to taking enforcement action." 664 F.3d at 944 (citations omitted). Reasoning along similar lines, the court in Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission, 324 F.3d 726 (D.C. Cir. 2003), held that a letter indicating that a

company's product likely presented a substantial product hazard and requesting "voluntary corrective action" did not suffice because the letter carried no legal consequences even though "there may be practical consequences" of refusing "voluntary compliance with the agency's request for corrective action" if the agency "actually decide[d] to pursue enforcement," id. at 731–32.  The same is true here, and, based on that reason alone, the Release does not constitute final agency action.

ForUsAll sees things differently.  It contends that the Release has direct and appreciable legal consequences in two respects.  First, it asserts that the Release raises the standard of care above the statutorily required duty of prudence under the circumstances by "caution[ing] plan fiduciaries to exercise *extreme care*" when dealing with cryptocurrency.  Opp'n at 4 (emphasis added) (citation omitted).  Second, ForUsAll reads the Release to impose a new obligation for entities to monitor investments in brokerage windows by stating that plan fiduciaries that allow "such investments through brokerage windows should expect to be questioned about how they can square their actions with their duties of prudence and loyalty in light of the risks described." Id. at 4–5 (emphasis removed) (citation omitted).  Neither phrase supports the proposed interpretation.

Regarding the standard of care, it requires a vivid imagination to read the words "extreme care" in the Release's opening paragraph as imposing crypto-specific fiduciary obligations that are above and beyond the ordinary duty of prudence required under 29 U.S.C. § 1104(a)(1)(B).  A much more sensible reading of that language, which the Department advances in its briefing, is that the Release used the term "extreme care" colloquially to emphasize the point that plan fiduciaries should be careful when deciding whether and how to offer cryptocurrency investment options considering their § 1104(a)(1)(B) duty to act prudently under the circumstances.  See

Reply at 11. It did not seek to change that standard. After all, the Release cites to case law interpreting the statutory standard in the very next paragraph, see Mot. to Dismiss, Ex. A at 1 & n.2 (citing Hughes, 142 S. Ct. at 742), reiterating that it did not seek to diverge from this well-worn standard by spinning a new one out of whole cloth. Regardless, it is hard to fathom how the supposed "extreme care" standard deviates from the ordinary duty of prudence that is "the highest known to the law." Stegemann, 970 F.3d at 469 (citation and quotation marks omitted). The duty of care language therefore "tread[s] no new ground" because it is perfectly in step with existing law. Indep. Equip. Dealers Ass'n, 372 F.3d at 428.

Turning to the brokerage windows, the Release does not extend fiduciary obligations to a previously duty-free domain or alter existing obligations in any way. It merely states that plans offering cryptocurrency options through their brokerage windows should be prepared to explain how those actions comport with their duties of prudence and loyalty—whatever those duties are. ForUsAll reads more meaning into this sentence because it believes ERISA and the relevant regulations make clear that, while retirement plans have a duty to prudently select and monitor investment vehicles that they offer through their designated menu of investment options, all bets are off when it comes to the brokerage window. See Opp'n at 5 (citing 29 C.F.R. § 2550.404a-5(f), (h)(4)). But, as noted above, the law on this issue is not as settled as ForUsAll suggests. See Moitoso, 451 F. Supp. 3d at 207. More to the point, the Release does not purport to change the status quo in this area as it leaves the existing law in place and "the world just as it found it." Valero Energy Corp. v. EPA, 927 F.3d 532, 536 (D.C. Cir. 2019). It seeks only to open a dialogue with retirement plans about how their cryptocurrency practices square with that pre-existing law. If ForUsAll is correct that the door is shut on arguing that these duties apply to the brokerage window, this could very well be a short conversation. See Nat'l Mining Ass'n, 758

F.3d at 252 (holding that guidance that does not "tell regulated parties what they must do or may

not do in order to avoid liability" and that may not "be the basis for an enforcement action" is not

final agency action because regulated entities are "free to ignore it" (citation omitted)).

Going outside the Release's actual text, ForUsAll points to several statements made by

Department officials which it asserts prove that the Department intended to create a new set of

rules that apply exclusively to cryptocurrency.  See Opp'n at 19.  But ForUsAll occasionally

mistakes reporters' summations as agency declarations.  The officials' actual statements tend to

reinforce the analysis above and, at most, suggest that its brokerage window reference was meant

to spark a conversation about plan's duties when offering investment options beyond their fixed

menus, which may be particularly relevant in the nascent area of cryptocurrency.  See, e.g.,

Kellie Mejdrich, Under Fire from Biz Groups, DOL Stands by Crypto Guidance, Law360 (Apr.

22, 2022), https://www.law360.com/articles/1486578.  Even if some officials' quotes suggest

that cryptocurrency will be subject to special scrutiny, see id. ("People shouldn't really be

interpreting this as a broader statement about what your obligations are—or are not—in other

contexts."), these stray remarks do not transform the Release into a binding decree that sets

divergent rules for different asset classes—and there is no evidence that the Department has ever

treated it as doing so in enforcement actions, see Nat'l Mining Ass'n, 758 F.3d at 253.

Finally, beyond what the Release said itself or what Department officials said about it,

ForUsAll draws attention to what the Release did *not* say: that it does not impose legally binding

requirements.  ForUsAll contends the absence of a disclaimer of legal effect here is noteworthy

given that the Department had included one in the past.  See Opp'n at 22; Compl. ¶ 40.  But this

variation is not as meaningful as ForUsAll makes it out to be because it may just reflect the

Department's 2021 rescission of an earlier rule requiring boilerplate disclaimers.  See Rescission

of Department of Labor Rule on Guidance, 86 Fed. Reg. 7237 (Jan. 27, 2021) (amending 29 C.F.R. Part 89).  Furthermore, while the existence of a disclaimer is relevant in determining whether an agency action is final, it is far from determinative.  Reading "the document as a whole," the Court is convinced that the Release does not have any legal effect.  Nat'l Mining Ass'n, 758 F.3d at 252.  For that reason, and because the Release is not the consummation of the Department's decisionmaking process, there is no final agency action for the Court to review.

*     *     *

There is one final issue that the Court must resolve before concluding.  After the parties completed briefing on the Department's motion to dismiss, ForUsAll filed a motion requesting an order of dismissal or, in the alternative, for the Court to strike the Department's reply.  ForUsAll contends that the Department made several important concessions in its reply brief—including that the Release is not binding, cannot be the predicate of enforcement actions, and imposes no new legal obligations—and that the reply improperly raised additional arguments and relied on material outside of the pleadings.  See Mot. for Entry of Order of Dismissal at 2–3.  For this reason, ForUsAll consents to dismissal of the case on the condition that the Court issue an order binding the Department to its representations.  Id. at 1.  Alternatively, ForUsAll requests that the Court strike the Department's reply or permit ForUsAll to file a surreply.  Id. at 2.  None of these requested actions are appropriate here.

The Court sees no reason to bind the Department to statements that it made in its reply.  For starters, such an order would be improper given that ForUsAll lacked standing to proceed in federal court in the first place.  This case is thus significantly different from Wheaton College v. Sebelius, 703 F.3d 551 (D.C. Cir. 2012) (per curiam), in which the plaintiffs had standing at the time of filing suit but the court concluded that their claim was no longer ripe after the

government promised not to enforce existing regulations that it was in the process of amending, id. at 552–53.  It was in that context that the court announced that it would "take the government at its word and . . . hold it to it" as it stayed the case pending finalization of the amendment.  Id. at 552.  Here, by contrast, the Court cannot issue a binding order without exceeding its jurisdiction.  Nor is such an order necessary because the Department is correct in asserting that the Release does not have the force of law.  It would therefore face an uphill battle if it ever deviated from this position, with or without an order from this Court reiterating that reality.

There is also no basis for granting ForUsAll's alternative requests to strike the Department's reply or to permit a surreply.  A reply brief is outside of the pleadings and therefore is not "subject to being stricken." Henok v. Chase Home Fin., LLC, 925 F. Supp. 2d 46, 52–53 (D.D.C. 2013).  Even if it could be the target of a motion to strike, the Department's reply brief would not warrant such "a drastic remedy" because the reply fairly responds to arguments that ForUsAll advanced in its opposition.  Naegele v. Albers, 355 F. Supp. 2d 129, 142 (D.D.C. 2005); see also Romero v. RBS Constr. Corp., No. CV 18-00179 (EGS), 2022 WL 522989, at *7 (D.D.C. Feb. 22, 2022) (collecting cases denying motions to strike where the opposing party has had an opportunity to address arguments).  For similar reasons, a surreply is unnecessary because ForUsAll already responded to the Department's relevant arguments so additional briefing would not be helpful in the resolution of this matter.  See Glass v. Lahood, 786 F. Supp. 2d 189, 231 (D.D.C. 2011).  The fact of the matter remains that the Court lacks jurisdiction over all claims because the Court cannot grant effective relief and the Release is not final agency action.

**IV.   Conclusion**

The Court will, accordingly, grant the Department's motion to dismiss the case.  The Court will also deny ForUsAll's motion for entry of order of dismissal or, in the alternative, to strike the Department's reply.  A separate Order follows.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>August 29, 2023</u>